Filed 1/17/14 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| COUNTY OF LOS ANGELES, | B249494 |
| Petitioner, | (Los Angeles County Super. Ct. No. BA352179) |
| v. | |
| SUPERIOR COURT OF LOS ANGELES COUNTY, | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING [NO CHANGE IN JUDGMENT] |
| Respondent; | |
| PEOPLE OF THE STATE OF CALIFORNIA, | |
| Real Parties in Interest. | |

THE COURT:

It is ordered that the opinion filed herein on December 19, 2013, be modified as follows:

1. On page 8, second full paragraph, line 5, delete the word "either".

2. On page 21, footnote 16, line 2, substitute the word "adequate" for the word "inadequate."

3. On page 21, footnote 16, lines 4-5, delete the words:

", and does not provide this court with the probate conservatorship order."

The first sentence of the footnote should then read:

> We decline to consider further whether the public guardian abused its
>
> discretion by determining that Kennebrew's probate conservatorship was an

inadequate alternative to a Murphy conservatorship, as the public guardian advised, because the petition does not contend that the trial court's order lacks supporting evidence on that ground.

There is no change in judgment.

Petitioner's petition for rehearing is denied.

_____

ROTHSCHILD, Acting P. J.      CHANEY, J.      JOHNSON, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| COUNTY OF LOS ANGELES, | B249494 |
| Petitioner, | (Los Angeles County Super. Ct. No. BA352179) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| THE PEOPLE, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS in mandate.  Norman J. Shapiro, Judge. Petition denied.

John F. Krattli, County Counsel, Leah D. Davis, Assistant County Counsel for Petitioner.

Jackie Lacey, District Attorney, Phyllis C. Asayama and Matthew Brown, Deputy District Attorneys for Real Party in Interest.

_____

Petitioner County of Los Angeles seeks review of the May 15, 2013 order of respondent Superior Court of Los Angeles, Honorable Norman J. Shapiro, ordering the public guardian to petition for a conservatorship and to act as conservator for real party in interest Nattie Kennebrew, Jr., under the Lanterman-Petris-Short Act, Welfare and Institutions Code sections 5000 et seq. We deny the writ, but issue this opinion to clarify the law with respect to the requirements for conservatorships under subdivision (h)(1) of Welfare and Institutions Code section 5008, and the authority of the superior court to review recommendations of administrative agencies concerning the imposition of such conservatorships.

## Background

### The charged felony

While suffering from dementia that caused him to believe that people were stealing his veterans' benefits, defendant Nattie Kennebrew, Jr., shot and killed a handyman who had come to do repairs at his apartment on January 28, 2009.

The evidence at Kennebrew's preliminary hearing was that on January 28, 2009, Kennebrew, then 83 years old and claiming to be legally blind, shot and killed Gerardo Ramos, who had come to his apartment to repair the garbage disposal. After shooting Ramos in the chest and head at close range, he tried to shoot Vyktor Arce, the building's resident manager, also at close range, but failed apparently because his gun was out of bullets. After being admonished and waiving his *Miranda* rights, Kennebrew told the investigating detective that he believed that the victim, the apartment manager, and an employee of the Veterans Administration had conspired to steal his veterans' benefits, in part because he is Black.

At the conclusion of his preliminary hearing on June 17, 2009, Kennebrew was held to answer on charges of murder (Pen. Code, § 187), and assault with a firearm (Pen. Code, § 245, subd. (a)(2)), in *People v. Kennebrew*, Los Angeles Superior Court Case No. BA352179. He was charged by information with one count of murder (Pen. Code, § 187), one count of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(2)), and one

count of attempted murder (Pen. Code, §§ 664, 187), and was arraigned on July 1, 2009. On November 23, 2009, Kennebrew was found to be incompetent to stand trial and was committed to placement at Patton State Hospital (Patton) pursuant to Penal Code section 1368.[1]

In a February 7, 2012 application for a mental health conservatorship and reexamination of Kennebrew in anticipation of his maximum commitment date,[2] doctors at Patton reported that Kennebrew suffered from "dementia of the Alzheimer's type, with late onset, with behavioral disturbance," ongoing paranoid delusions, worsening dementia, inability to accept voluntary treatment, and inability "to provide for his . . . personal needs for food, clothing, or shelter as a result of a mental disorder." The report identified Kennebrew as "a danger to others because of fixed delusion of persecutory type," noting that although he has not been violent during his hospitalization, he had threatened to kill a fellow patient at Patton, indicating "that the risk of danger to others is high and he needs to be placed in a structured environment."

---

[1] Under Penal Code section 1367, subdivision (a), "A person cannot be tried or adjudged to punishment while that person is mentally incompetent." Penal Code section 1370, which governs the procedure following a finding that a defendant is incompetent to stand trial, applies "to a person who is charged with a felony and is incompetent as a result of a mental disorder." (Pen. Code, § 1367, subd. (b).) Patton has been identified as a "prisonlike institution[]" that houses conservatees under the Lanterman-Petris-Short Act. (*Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 182, fn. 18.)

[2] Penal Code section 1370, subdivision (c)(1) provides for a maximum commitment of three years, after which the defendant must be returned to the committing court.

On August 23, 2012, the trial court referred the matter to the Los Angeles County Office of the Public Guardian for investigation for a possible conservatorship.[3] On August 24, 2012 the public guardian responded by letter that it would not seek a conservatorship for Kennebrew, because Kennebrew's diagnosis of dementia is not a qualifying mental disorder diagnosis under the Lanterman-Petris-Short Act (LPS Act), Welfare and Institutions Code section 5000 et seq.[4] Because the condition of a patient with Alzheimer's type dementia is not likely to improve with treatment, the public guardian explained, county funds cannot be used for that purpose.

The court again referred the matter to the public guardian for investigation on October 25, 2012, based on the Patton physicians' application for conservatorship. A November 7, 2012 neuropsychological evaluation by medical personnel at Patton cited Kennebrew's threat to kill his roommate soon after his arrival at Patton, and based on his lack of remorse or guilt about the victims of his charged offenses ("Kennebrew continues to believe he did nothing wrong"), concluded that "there is a significant likelihood that he may be violent in the absence of supervised treatment."

The public guardian's November 16, 2012 response to the court explained why it would not petition for conservatorship: Dementia is not recognized as a recoverable mental health illness and thus does not meet the criteria for a conservatorship under the LPS Act.

On April 5, 2013, the probate department of the court, acting independent of the criminal department in case no. BA352179, established a conservatorship for Kennebrew.

_____

[3] The public guardian is mandated county officer. (Gov. Code, § 24000, subd. (w).) In Los Angeles County the Office of the Public Guardian, a division of the Department of Mental Health, acts as conservatorship investigator and conservator for individuals who are seriously and persistently mentally ill and in need of involuntary mental health treatment, and for frail and vulnerable elderly or dependent adults. (Welf. & Inst. Code, §§ 5350, 5351, 5352.)

[4] Further statutory references are to the Welfare and Institutions Code unless otherwise identified.

It appointed Kennebrew's son as conservator, granted him permission to take Kennebrew to live with him in Michigan, anticipating that the California conservatorship would be terminated upon establishment of a Michigan conservatorship.

On April 10, 2013, the criminal department of the court ordered the public guardian to provide it with the available options "to place Mr. Kennebrew in an environment where he will not pose a danger to the public." The public guardian's office responded on May 8, 2013, explaining why it believed conservatorships under the LPS Act would not be appropriate for Kennebrew, and why the conservatorship established by the probate department was appropriate under the circumstances.

Following hearings on May 9 and 15, 2013, and written submissions by the People and the public guardian, the court found that Kennebrew remains incompetent to stand trial; that he meets the requirements for a conservatorship under the LPS Act (§ 5008, subds. (h)(1)(A) & (h)(1)(B)); and that he has been diagnosed by Patton as presenting a substantial danger of physical harm to others by reason of his mental disorder. The court also found that no rational basis nor compelling interest outweighs the concerns for public safety and need for a conservatorship under the LPS Act, or justifies the public guardian's refusal to act as conservator for Kennebrew. And it found that the conservatorship established for Kennebrew by the probate department does not address the court's public safety concerns and does not preclude the criminal court from ordering a conservatorship under the LPS Act.

**The challenged orders**

Based on these findings and the court's determination that the public guardian's refusal to act as conservator abused its discretion, on May 15, 2013 the court ordered the public guardian to act as conservator for Kennebrew; that Kennebrew remain at Patton; and that the public guardian petition for establishment of a conservatorship pursuant to section 5008, subdivisions (h)(1)(A) and (h)(1)(B), as requested by Patton and the district attorney's office.

5

**The requested relief**

Los Angeles County Counsel, representing the public guardian, petitioned this court for writ of mandate on behalf of the County of Los Angeles, on June 20, 2013. The petition asks this court to set aside respondent court's May 15, 2013 orders, on two grounds: (1) that the public guardian's office has sole discretion to petition for conservatorship under the LPS Act, or to decline to file such a petition, and the superior court has no authority to order the public guardian to act as a conservator or to petition for conservatorship; and (2) that the public guardian's office correctly determined that Kennebrew is not eligible for a conservatorship under section 5008, subdivisions (h)(1)(A) or (h)(1)(B), because dementia is not a qualifying diagnosis for a conservatorship under the LPS Act.[5]

On June 26, 2013, this court ordered a temporary stay of the May 15, 2013 orders in *People v. Kennebrew*, *supra*, LASC Case No. BA352179, pending further order. On October 1, 2013, we entered an order to show cause why the orders of May 15, 2013 in that case should not be vacated and the court should not be ordered to issue a new and different order.

Based on our review of the responses to the order to show cause by the Los Angeles County Counsel on behalf of petitioner, and the Los Angeles District Attorney on behalf of real party in interest People of the State of California, we deny the requested relief for the reasons explained below.

## Discussion

### A. Conservatorships under the LPS Act

The LPS Act, which governs the involuntary treatment of the mentally ill in California, was enacted in order to end "the inappropriate and indefinite commitment of the mentally ill, providing prompt evaluation and treatment of persons with serious

---

[5] County counsel also requested a stay of proceedings in the superior court with respect to the challenged orders (which were to take effect on July 1, 2013) while its petition is pending in this court.

6

mental disorders, guaranteeing and protecting public safety, safeguarding the rights of the involuntarily committed through judicial review, and providing individualized treatment, supervision and placement services for the gravely disabled by means of a conservatorship program." (*Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1008; § 5001.)

Three types of conservatorships are relevant to this case, the first two of which come under the LPS Act, and require a finding that the prospective conservatee is "gravely disabled." However, for each of these conservatorships the requirements for a determination that a prospective conservatee is gravely disabled is different.

The first of these conservatorships under the LPS Act, referred to as a subdivision (h)(1)(A), or "LPS conservatorship," is one in which the conservatee, is "gravely disabled"—which is defined in this subdivision to mean that "as a result of a mental disorder," the conservatee "is unable to provide for his or her basic personal needs for food, clothing, or shelter." (§ 5008, subd. (h)(1)(A).)

The second category of conservatorships under the LPS Act, known as a subdivision (h)(1)(B), or "Murphy conservatorship," is one in which the conservatee is subject to a pending indictment or information charging him or her with a felony involving death, great bodily harm, or threat to the physical well-being of another; in which "as a result of mental disorder," the conservatee is unable to understand or meaningfully participate in the pending criminal proceedings; and in which the conservatee has been found to be mentally incompetent under the procedures set forth in Penal Code section 1370.[6] (§ 5008, subd. (h)(1)(B).) To these three statutory requirements for the imposition of a Murphy conservatorship our supreme court has added a fourth: the constitutionally required finding that the conservatee is "currently dangerous as the result of a mental disease, defect, or disorder." (*Conservatorship of Hofferber*, *supra*, 28 Cal.3d at p. 178.) Under Penal Code section 1370, subdivision

---

[6] Penal Code sections 1370 and 1370.01 provide procedures for commitment and treatment of criminal defendants who are found to be mentally incompetent to stand trial.

(c)(1), a criminal defendant who is found incompetent to stand trial is subject to a commitment for a period not to exceed three years. Any further commitment is permitted only if the requirements for a conservatorship under one of the provisions of the LPS Act are met. (*People v. Karriker* (2007) 149 Cal.App.4th 763, 776 (*Karriker*).)

The third type of conservatorship relevant to this case is a "probate conservatorship," under Probate Code section 1800 et seq. Generally speaking, probate conservatorships are imposed when it is established that the conservatee is unable to provide properly for his or her personal needs for physical health, food, clothing, or shelter. (Prob. Code, § 1801.) Unlike for conservatorship under the LPS Act, however, probate conservatorships may be ordered upon the application of relatives or friends of the conservatee, rather than only upon the application of the public guardian. (Prob. Code, § 1820, subd. (a); § 5114; *St. Joseph Hospital v. Kuyper* (1983) 146 Cal.App.3d 1086, 1090.) In Los Angeles County, probate conservatorships are handled by the Probate Department, while LPS Act conservatorships are heard in Department 95-A of the superior court. (Super. Ct. L.A. County, Local Rules, rule 2.7(c)(2)(B).)

In ordering the public guardian to establish a conservatorship, the trial court found that Kennebrew comes within the "gravely disabled" definitions that apply to conservatorships under both subdivisions (h)(1)(A) and (h)(1)(B) of section 5008. However, the People have conceded in this proceeding that the record contains inadequate evidence to show either that Kennebrew was unable to care for himself, the requirement for an LPS conservatorship under section 5008, subdivision (h)(1)(A). Based on this concession, we consider only whether the court abused its discretion by ordering the public guardian to establish a conservatorship and to act as conservator under section 5008, subdivision (h)(1)(B)—a Murphy conservatorship—and we do not examine the propriety of these orders under section 5008, subdivision (h)(1)(A).

## B. Standards of Review

Petitioner contends that the trial court erred by finding that Kennebrew's dementia qualifies as a "mental disorder" within the meaning of the LPS Act (contrary to the public

8

guardian's determination that it does not); and that the trial court lacked authority to order the public guardian to establish a conservatorship and act as conservator for Kennebrew.

The issue in the trial court was whether the public guardian had abused its discretion by refusing to establish a conservatorship and to act as Kennebrew's conservator. The effect of the trial court's order was to require the public guardian to establish a conservatorship and to act as Kennebrew's conservator—in effect, a writ of mandate. A traditional writ of mandate is appropriate "to compel a public official to perform an official act required by law." (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 442.) Although mandamus cannot be used to compel an official to exercise discretion in a particular manner, it may issue in order to require that discretion is exercised consistent with the law. (*Shepherd v. Superior Court* (1976) 17 Cal.3d 107, 118; *Common Cause v. Board of Supervisors*, *supra*, 49 Cal.3d at p. 442 [mandate may issue to compel public official to exercise discretion "under a proper interpretation of the applicable law"].)

The trial court in this case reviewed the public guardian's determination that the applicable law does not obligate or empower it to establish a conservatorship for Kennebrew or to act as his conservator under the LPS Act, after affording the public guardian the opportunity to be heard with respect to the facts and the law. (*Klajic v. Castaic Lake Water Agency* (2001) 90 Cal.App.4th 987, 995 [under Code Civ. Proc., § 1085, trial court reviews administrative agency's action to determine whether it is arbitrary, capricious, or entirely without evidentiary support, contrary to public policy, or procedurally unfair or unauthorized by law].) In this court we treat the trial court's factual determinations as conclusive if they are supported by substantial evidence, but we independently review statutory interpretations and other issues of law. (*Ibid.*)

### C. The Trial Court Correctly Ordered The Public Guardian To Petition For A Murphy Conservatorship.

Petitioner contends that the public guardian correctly exercised its discretion to refuse to seek a conservatorship under the LPS Act because Kennebrew's dementia does not qualify as a "mental disorder," one of the defining requirements for conservatorships

9

under that act.[7] As noted above, for an LPS conservatorship, the conservatee must be unable to provide for his or her basic personal needs for food, clothing, or shelter "as a result of a mental disorder"—thereby meeting the definition of "gravely disabled" that applies to that type of conservatorship. (§ 5008, subd. (h)(1)(A).) For a Murphy conservatorship, the definition of "gravely disabled" is different: the conservatee must be "gravely disabled" by virtue of being subject to an information or indictment charging a serious violent felony, must be unable "[a]s a result of mental disorder" to meaningfully participate in his or her defense to the charge, and must also be found to be "currently dangerous as the result of a mental disease, defect, or disorder." (§ 5008, subd. (h)(1)(B); *Conservatorship of Hofferber*, *supra*, 28 Cal.3d at p. 178.) If Kennebrew's dementia is not a "mental disorder" within the meaning of the LPS Act, the LPS Act does not apply to Kennebrew, and the court abused its discretion by ordering the public guardian to seek the Murphy conservatorship.

The provisions for Murphy conservatorships were added to the LPS Act in order to distinguish between persons who do, and do not, present a danger to the public. They are intended to "address the difficult problem of integrating and resolving the conflicting concerns of protecting society from dangerous individuals who are not subject to criminal prosecution," while "preserving a libertarian policy regarding the indefinite commitment of mentally incompetent individuals who have yet to be convicted of criminal conduct, and safeguarding the freedom of incompetent criminal defendants who present no threat to the public." (*People v. Skeirik* (1991) 229 Cal.App.3d 444, 456; *Karriker*, *supra*, 149 Cal.App.4th at p. 775.) For a conservatee under subdivision (h)(1)(A) of section 5008, the court is required to place the conservatee in the least restrictive available placement. (§ 5358, subd. (a)(1)(A).) However, for a conservatee who meets the "gravely disabled" definition of subdivision (h)(1)(B) of section 5008, the priority is public safety, not the

_____

[7] Petitioner also argues that Kennebrew does not qualify for an LPS Act conservatorship because the earlier-imposed probate code conservatorship provided an available alternative to the Murphy conservatorship ordered in this case.

10

least restrictive available placement.  The placement must be one "that achieves the purposes of treatment of the conservatee and protection of the public."  (§ 5358, subd. (a)(1)(B); *Karriker*, *supra*, 149 Cal.App.4th at p. 778.)  As the public guardian put it, "[i]n an LPS conservatorship the primary focus is least restrictive placement and in a Murphy conservatorship it is the protection of the public."

The *Karriker* decision held that the public guardian cannot be ordered to establish a conservatorship under the LPS Act if it determines—in its sole discretion—that the conservatee's dementia does not constitute a "mental disorder" within the meaning of the LPS Act.  (*Karriker*, *supra*, 149 Cal.App.4th at pp. 778-779, 783.)  Therefore, petitioner contends, the public guardian was justified in determining that the Murphy conservatorship sought by the district attorney and ordered by the court in this case was not appropriate, because—as the court decided in *Karriker*—dementia is not a "mental disorder" within the meaning of the LPS Act.

Upon independent review, we conclude that the trial court in this case correctly interpreted the LPS Act to provide that dementia is a "mental disorder" within the LPS Act's meaning, contrary to the statutory interpretation urged by the public guardian and set forth in *Karriker*.  We also conclude that on this point the *Karriker* decision is factually distinguishable and does not compel a contrary interpretation of the applicable statutes.

### 1. The Facts Of The *Karriker* Decision Distinguish It From The Case At Hand.

The facts in *Karriker* are somewhat similar to those in the case at hand, but the differences are significant.  The defendant in *Karriker* had been charged by complaint with one felony count of making a criminal threat (Pen. Code, § 422), and one misdemeanor count of battery (Pen. Code, § 242).  Before his preliminary hearing, a medical officer appointed under Penal Code section 1368 reported that Karriker was not competent to stand trial, and would be unlikely to be restored to competence.  On that basis the court ordered Karriker committed to Napa State Hospital for the maximum three-year term under the criminal competency statute.  (*Karriker*, *supra*, 149

11

Cal.App.4th at p. 770.)  A subsequent examination led to a determination by the conservator investigator (analogous to the public guardian in this case) that an LPS conservatorship was not indicated, because Karriker was not "gravely disabled" as the result of a mental disorder within the meaning of section 5008, subdivision (h)(1)(A). Although "Karriker suffers from Amnestic Disorder due to a head injury and chronic alcoholism and alcohol dependence," the investigator concluded, there was no evidence that he is "unable to provide for his basic needs of food, clothing, or shelter as a result of a mental disorder . . . ." (*Id.* at p. 771.)  On that basis the investigator recommended that "'establishment of a probate conservatorship would be inappropriate.'" (*Ibid.*)[8]

In order to qualify for a Murphy conservatorship—but not an LPS conservatorship under section 5008, subdivision (h)(1)(A), as in *Karriker*—the defendant must be subject to a pending indictment or information for a serious and violent felony, and must be found to present a substantial danger of physical harm to others by reason of his mental disorder.  (§ 5008, subd. (h)(1)(B).)  In *Karriker*, there was no pending indictment or information, and the court had before it no indication that Karriker posed a current danger.  (*Karriker, supra*, 149 Cal.App.4th at pp. 784, fn. 12, 788, fn. 14.)[9]  The *Karriker* court's conclusion that a Murphy conservatorship would not be justified in that case therefore resulted not just from the absence of the conditions required for the imposition of such a conservatorship, but also from the fact that the remedy sought in that case was an LPS conservatorship under subdivision (h)(1)(A) of section 5008.

_____

[8] Despite the diagnosis of chronic alcoholism and alcohol dependence, the *Karriker* decision does not discuss the applicability of the definition of "gravely disabled" in section 5008, subdivision (h)(2), as "a condition in which a person, *as a result of impairment by chronic alcoholism*, is unable to provide for his or her basic personal needs for food, clothing, or shelter." (Italics added.)

[9] In *Karriker,* the trial court "had before it no evidence indicating that defendant currently poses a danger to society," and while an LPS conservatorship was recommended because he was gravely disabled under section (h)(1)(A) of section 5008, "at no time did anyone opine that he is dangerous." (*Karriker, supra*, 149 Cal.App.4th at p. 788, fn. 14.)

12

Here, unlike in *Karriker*, the conditions required for the imposition of a Murphy conservatorship were found by the trial court to be satisfied, and the petition does not challenge the sufficiency of the evidence to support those findings. Unlike in *Karriker*, Kennebrew was subject to a pending information charging him with serious and violent felonies; and he was diagnosed as presenting a continuing danger.[10]

Moreover, in this case, the trial court found that Kennebrew's probate conservatorship (which permitted his removal to his son's home in Michigan, rather than his placement in a secure locked mental health facility under the court's jurisdiction) did not address the court's public safety concerns. That is a statutorily mandated factor, not present in *Karriker*, which controls Kennebrew's placement in this case. (§§ 5350, subd. (a)(2); 5358, subd. (a)(1)(B); *Karriker*, *supra*, 149 Cal.App.4th at p. 778.)

## 2. Dementia is a "mental disorder" within the meaning of the LPS Act.

In *Karriker*, the appellate court reversed the trial court's decision to impose an LPS conservatorship not only because it concluded that a probate conservatorship would be appropriate under the circumstances, but also because it found that the defendant's dementia was not a qualifying mental disorder within the meaning of section 5008, subdivision (h)(1)(A) of the LPS Act. (*Karriker*, *supra*, 149 Cal.App.4th at p. 787.) A

_____

[10] The most recent report of Kennebrew's condition under Penal Code section 1370, dated August 23, 2012, reported his diagnosis under DSM-IV as "Dementia of the Alzheimer's Type, with late onset, with behavior disturbance," and "Psychotic Disorder with delusions due to Alzheimer's Disease." Upon his admission to the hospital, "his fund of knowledge, abstract thinking, and general intelligence seemed to be impaired by psychosis." He is unable and incompetent to understand the criminal proceedings against him, to assist counsel in his defense, or to care for himself, by virtue of his "paramount and ongoing" belief that his attorney is part of a government plot to appropriate his veterans' benefits, his worsening dementia, as well as various physical problems. He has no remorse or insight into the consequences of his alleged criminal act, "no insight into his mental illness." He has repeatedly stated that he considers himself a victim, and would repeat his alleged crime. The referring physicians at Patton found "a significant likelihood that [Kennebrew] may be violent in the absence of a supervised treatment," and recommended that the court consider conservatorship under Penal Code section 1370, subdivision (c)(2). While this diagnosis plainly includes dementia, it is not at all clear that it necessarily excludes psychotic mental disorders of other origins.

13

Probate Code conservatorship, "not an LPS conservatorship . . . , addresses the special needs of a person with dementia," the court held. (*Ibid.*) For that reason, the court held, the public guardian was justified in determining that an LPS conservatorship was unavailable to Karriker. "The ultimate decision to file a petition requesting conservatorship," the court found, "is vested in [the public guardian's] sole discretion." (*Id.* at p. 772.)

Petitioner takes the same position in this case. It argues that in order to qualify for a Murphy conservatorship under the LPS Act, Kennebrew must be found to be suffering from a "mental disorder," and that the trial court exceeded its authority "because the defendant suffers from dementia, which is not a qualifying diagnosis" under the LPS Act.

Petitioner concedes that although *Karriker* found that dementia is not a mental disorder under the LPS Act, an earlier decision held that the term "mental disorder" in the LPS Act refers to "those disorders listed by the American Psychiatric Association in its Diagnostic and Statistical Manual of Mental Disorders [DSM]." (*Conservatorship of Chambers* (1977) 71 Cal.App.3d 277, 283, fn. 5.) The DSM-IV lists dementia as among mental disorders that include cognitive deficits resulting from (among other causes) "the combined effects of cerebrovascular disease and Alzheimer's disease."[11] A 1989 Opinion of the California Attorney General finds, consistent with the appellate court's reference to the DSM definition of mental disorders, that the Legislature intended that the general term "mental disorder" in the LPS Act would "evolve with the times" in order to reflect the term's "current meaning in the medical and psychological community." (72 Ops.Cal.Atty.Gen. 41, 47, 49 (1989).) Significant here, that attorney general opinion

_____

[11] "The disorders in the 'Dementia' section [of DSM-IV] are characterized by the development of multiple cognitive deficits (including memory impairment) that are due to the direct physiological effects of general medical condition, to the persisting effects of a substance, or to multiple etiologies (e.g., the combined effects of cerebrovascular disease and Alzheimer's disease)." At the request of real party in interest, without objection by petitioner, we take judicial notice of the cited portions of DSM-IV.

14

concludes that dementia is a qualifying diagnosis for hospitalization in a State Hospital under the LPS Act. (72 Ops.Cal.Atty.Gen. 41 (1989).)[12]

The linchpin of petitioner's rejection of this authority and contrary interpretation of the LPS Act lies in its contention that the Legislature's enactment of Probate Code section 2356.5 in 1996 mandates a re-interpretation of the LPS Act that excludes dementia from the mental disorders that come within its terms. Probate Code section 2356.5 added extensive provisions respecting the powers of probate conservators to address the rights and needs of individuals suffering from dementia, as opposed to other forms of mental disability. It expressly provides that the applicable definition of dementia is set forth in the last-published edition of the DSM, and that people with dementia "should have a conservatorship to serve their unique and special needs." (Prob. Code, § 2356.5, subd. (a)(1).)

Because Probate Code section 2356.5 deals specifically with conservatorships for individuals with dementia, which is not specifically mentioned in section 5008, petitioner argues that section 2356.5 must be interpreted to set forth the exclusive means for dealing with these individuals; the provisions for "gravely disabled" individuals in section 5008, subdivision (h)(1) of the LPS Act must be interpreted to have been superseded and to no longer apply to those whose mental impairment results from dementia. "Clearly," the petition contends, the passage of Probate Code section 2356.5 was intended by the Legislature "to ensure that dementia patients would not be made conservatees under the LPS Act, but only under the Probate Code."

We are not persuaded that this is what the Legislature intended. Neither section 2356.5 nor any other provision of the Probate Code purports to say that this section

_____

[12] "Persons over 21 years of age suffering from Alzheimer's disease, brain injuries or other organic brain disorders may fall within the scope of section 5150 of the Welfare and Institutions Code and be eligible for evaluation and treatment if as a result thereof they are a danger to themselves or others or are gravely disabled. [¶] . . . Short-Doyle funds or state hospital facilities would be legally available for the provision of evaluation and treatment services to such individuals." (72 Ops.Cal.Atty.Gen. 41, 42 (1989).)

supersedes the adoption by existing authorities of the DSM as an expression of the LPS Act's meaning of the term "mental disorder"—which includes disorders resulting from dementia. (See fns. 10 & 11, *ante*.) And neither section 2356.5 nor any other provision of the Probate Code fills the gap in the law that would result if the LPS Act were interpreted to preclude its application to those suffering from dementia.

Petitioner has argued that its interpretation of section 5008, subdivision (h)(1)(B) to exclude dementia as a qualifying mental disability is bolstered by the California Senate Rules Committee's legislative analysis of Senate Bill No. 1481 in the enactment Probate Code section 2356.5. We take notice of these materials (without objection by the People) pursuant to the petitioner's request. (See *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 32 [re judicial notice of Legislative Committee Reports and Analyses].)

The Rules Committee analysis states that existing law (before the passage of Sen. Bill No. 1481) permitted placement of conservatees in locked facilities under both the LPS Act and the Probate Code, but that most courts at that time would not authorize placement of a dementia patient in a secured facility except under an LPS conservatorship—a requirement that it found to be "unnecessarily cumbersome . . . and unnecessary as applied to dementia patients." To resolve this problem, Senate Bill No. 1481 would incorporate into the Probate Code "the protections of the LPS conservatorship," in order to alleviate this unnecessary burden by allowing courts to authorize placement of probate conservatees with dementia in locked or secured facilities, under the same circumstances and conditions as apply to LPS conservatorships.

Far from indicating a legislative intention that dementia is not a qualifying mental disability under section 5008, subdivision (h)(1)(B), the Rules Committee analysis suggests the opposite. First, the Rules Committee analysis refers only to "LPS conservatorships" under section 5008, subdivision (h)(1)(A), not to Murphy conservatorhips under section 5008, subdivision (h)(1)(B), and not to dementia patients who are charged with violent crimes and who pose a continuing threat of violence. Second, the Rules Committee analysis confirms that at the time Probate Code section

16

2356.5 was enacted, individuals who were "gravely disabled" by dementia were among the "gravely disabled" persons to whom the LPS Act was applied.

Probate Code section 2356.5 adds much to enable courts and conservators to protect the rights and needs of people suffering from dementia, and to provide conservatorship placements that are far less restrictive and cumbersome than those under the LPS Act, when those placements are appropriate. But that provision leaves wholly unmentioned those who are gravely disabled within the meaning of section 5008, subdivision (h)(1)(B), and who pose a continuing threat to public safety. Nothing in Probate Code section 2356.5 addresses the courts' obvious need to consider and provide for matters of public safety in dealing with individuals such as Kennebrew. We see no indication of a legislative intention that by enacting Probate Code section 2356.5 the Legislature intended to exclude dementia from the definition of mental disabilities that come within the LPS Act.

Section 5008, subdivision (h)(1)(B) provided for Murphy conservatorships in order to address the public's need for protection from the risks of violence by criminal defendants who are so mentally disabled that they cannot participate in the criminal justice system, yet continue to pose a risk of violence to the public. (*Karriker*, *supra*, 149 Cal.App.4th at pp. 776–777; *Conservatorship of Hofferber*, *supra*, 28 Cal.3d at pp. 176–177 ["the state may confine incompetent criminal defendants, *on grounds that they remain violently dangerous*, when a magistrate or grand jury has found probable cause to believe that they have committed violent felonies"].) Yet according to the public guardian, one who is diagnosed with dementia (rather than "a psychiatric diagnosis") is now rendered ineligible for placement in any type of locked facility that is available in an LPS conservatorship—in either a state hospital, or an IMD (Institution for Mental

17

Disease).[13] The elimination of dementia from the diagnoses to which the LPS Act applies therefore would render unavailable one of the only (perhaps the only) practical means for the court's protection of public safety in dealing with gravely disabled criminal defendants which in this context include those who pose a public danger whose mental disorders result from dementia.

The establishment of Kennebrew's existing probate conservatorship (the only apparent alternative if Kennebrew's Murphy conservatorship and placement at Patton is not renewed), did not require—or permit—the probate court to consider the potential threats to public safety resulting from his release from a secured facility and his placement with his son in a private residence. Under Probate Code section 1800.3, subdivision (b), the court's primary task is to ensure that any conservatorship will be the "least restrictive alternative needed for the protection of the conservatee"—not the public. Unless Kennebrew is a gravely disabled conservatee within the meaning of section 5008, subdivision (h)(1)(B), "protection of the public" is not among the factors that the court or his conservator may consider in his placement. (§ 5358, subd. (a)(1)(A).)

Section 5008, subdivision (h)(1)(B), permits the court to impose involuntary conservatorships, with confinement in locked and secure facilities, when a magistrate or grand jury has found probable cause to believe that the conservatee has committed a serious and violent felony, and remains violently dangerous. If dementia is excluded from the category of mental disabilities that may justify the court in taking action under that provision, as petitioner urges it must be, the court would be stripped of the ability to address the public safety issues that are the central concern of section 5008, subdivision (h)(1)(B). For each of these reasons, we conclude that the trial court correctly ruled that

_____

[13] As the public guardian's report explains, Kennebrew is ineligible for an IMD placement, which under federal law is available only to those under the age of 65. Yet the court has no power to require private nursing facilities to accept placements, and 30 private facilities had already refused the public guardian's requests for Kennebrew's placement.

Kennebrew's dementia is a "mental disorder" within the meaning of section 5008, subdivision (h)(1)(B) of the LPS Act.

### 3. The order requiring the public guardian to seek a Murphy conservatorship for Kennebrew did not exceed the trial court's authority or abuse its discretion.

The public guardian was required to "investigate all available alternatives to conservatorship and [to] recommend conservatorship to the court only if no suitable alternatives are available." (§ 5354.) The public guardian reported that no conservatorship under the LPS Act was appropriate for Kennebrew, both because Kennebrew's dementia is not a mental disability under the LPS Act (as discussed above), and also because Kennebrew's earlier-imposed probate conservatorship is a suitable and less-intrusive alternative to an LPS conservatorship. The trial court found, however, that the existing probate conservatorship neither addressed or satisfied the court's public safety concerns. These factual determinations are amply supported in the record, and the petition does not contend otherwise.[14]

Petitioner contends also that the trial court abused its discretion by ordering the public guardian to seek an LPS Act conservatorship for Kennebrew because only the conservatorship investigator (in this case the public guardian)—not the court—has discretion to decide whether to seek an LPS conservatorship in any particular case. (*Karriker*, *supra*, 149 Cal.App.4th at pp. 777-778, 782-787.)

_____

[14] The petition does not challenge the court's orders on the ground that the record lacks substantial evidence to support any of their factual bases. We disregard the petitioner's argument, made for the first time in its Reply To Opposition To Petition For Writ Of Mandate, that Kennebrew's alleged violent felonies, his threat to kill his roommate at Patton, his lack of remorse and continuing persecutory delusions, and his physicians' reports of continuing dangerousness, might not be enough to support the trial court's finding that he continues to pose a public danger. (*Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99 [issues not raised or supported by argument or citation to authority are waived].)

19

The *Karriker* decision discusses this proposition at some length (*Karriker*, *supra*, 149 Cal.App.4th at pp. 782-788), and concludes that "the determination of whether [the proposed conservatee] is gravely disabled as a result of a mental disorder and amenable to treatment under the [LPS] Act, justifying the filing of a petition under the LPS Act, is vested solely in [the conservatorship investigator's] discretion." (*Karriker*, *supra*, 149 Cal.App.4th at p. 782.) Although a court may determine that a conservatorship petition should be rejected, "the court may not control the discretion conferred upon another public official to determine whether to seek such relief." (*Id.* at p. 787.)

But the *Karriker* decision also expressly states that whether the court did or did not have authority to review the investigator's refusal to seek an LPS conservatorship was irrelevant to its decision. "Accepting the premise that a public conservator might abuse his or her discretion in refusing to file a petition for a conservatorship under the LPS Act," the *Karriker* decision explains, still no LPS Act conservatorship was available under applicable law. (*Karriker*, *supra*, 149 Cal.App.4th at p. 788.) Moreover, as petitioner expressly confirms, the court in *Karriker* left undecided the question whether a public guardian might abuse its discretion by failing to seek an LPS conservatorship "under some other set of facts."[15] In other words, *Karriker* did not determine whether a public guardian's refusal to establish an LPS conservatorship might be reviewed as an abuse of discretion.

The case at hand arose "under some other set of facts" than those in *Karriker*. In this case, unlike in *Karriker*, the public guardian's refusal to seek an LPS conservatorship resulted from its erroneous interpretation of the law, to preclude a Murphy conservatorship when dementia is involved. And unlike in *Karriker*, the alternative

_____

[15] "Leaving open the question if a public guardian, under some other set of facts, might abuse their discretion for failing to file a petition for LPS conservatorship, the court concluded that there was no such abuse of discretion in the *Karriker* case because the Public Guardian had conducted a proper investigation and because a defendant with dementia would properly be the subject of a probate conservatorship. (*Karriker* at p. 788.)"

20

remedy sought by the public guardian—a probate conservatorship outside of the court's jurisdiction, lacking the protections of a locked or secure facility and the oversight of personnel trained in the care of dangerous criminals suffering from dementia—failed to address or to satisfy the concerns for public protection and safety that are legally mandated with respect to the placement of criminal defendants such as Kennebrew. (§ 5350, subds. (b)(2), (e)(4); § 5358, subd. (c)(2) ["first priority" with respect to placement of defendant eligible for Murphy conservatorship "shall be placement in a facility that achieves the purposes of treatment of the conservatee and protection of the public"].)[16] The public guardian's failure to consider whether Kennebrew remained dangerous to the public is hardly surprising. The duties of the conservatorship investigator under the LPS Act, and the subjects to be addressed in its report to the court, are set forth at length in section 5354. They include a duty to determine the availability of suitable alternatives to an LPS Act conservatorship; but they do not include consideration of the issue that is central to the determination of eligibility for a Murphy conservatorship: whether the potential conservatee presents a risk of serious danger to the public.

Section 5354 does imply that the court has authority to order the conservatorship investigator to establish an LPS conservatorship if the investigator has abused its discretion in declining to recommend that remedy. Section 5354 provides that "[i]f the officer providing conservatorship investigation recommends against conservatorship," in rendering judgment on the investigator's negative recommendation the court may

_____

[16] We decline to consider further whether the public guardian abused its discretion by determining that Kennebrew's probate conservatorship was an inadequate alternative to a Murphy conservatorship, as the public guardian advised, because the petition does not contend that the trial court's order lacks supporting evidence on that ground, and does not provide this court with the probate conservatorship order. We note, however, that the probate conservatorship apparently approved Kennebrew's placement in his son's home in Michigan, out of the court's jurisdiction, in a facility that apparently is neither licensed, locked, nor secure, and with no indication of a full-time caretaker or caretakers who have training or experience with dementia patients with a history and continuing potential for violence. On this incomplete record we share the trial court's concern that the public safety is not adequately addressed.

21

"consider the contents" of the investigator's report. Thus section 5354 provides that the court has discretion to render judgment on the availability of the conservatorship under the LPS Act, and the alternatives to it, even when the conservatorship investigator has recommended against that remedy. The court has discretion to review and consider the negative recommendation, then to enter an order that either does or does not follow that recommendation. Unless the court has discretion to override the investigator's negative recommendation, there would be no reason for it to "consider the contents" of the report when determining whether a conservatorship should be imposed. Unless the court has discretion to order the establishment of an LPS conservatorship notwithstanding the investigator's negative recommendation, the provision would have no meaning or purpose.

We therefore conclude that *Karriker* correctly stands for the proposition that when the statutory requirements for an LPS conservatorship are not met, the superior court may abuse its discretion by ordering the public guardian to seek such a conservatorship. But we decline to extend that rule to hold that the superior court lacks authority to determine that the public guardian has abused its discretion when its erroneous interpretation of a controlling statute has resulted in a refusal to seek an LPS conservatorship when the statutory requirements for that remedy are met.

## Conclusion

Penal Code section 1370, concerning the treatment of defendants who are charged with serious and violent felonies but are unable to stand trial due to their mental condition, provides that when such a defendant is found by the court to be gravely disabled as defined by section 5008, subdivision (h)(1)(B), "the court shall order the conservatorship investigator . . . to initiate conservatorship proceedings" under the LPS Act. (Pen. Code, § 1370, subd. (c)(2).) We believe that under this provision the initiation of conservatorship proceedings refers to petitioning for conservatorship under the LPS Act, enabling the court to appoint counsel for the defendant and to commence the investigation and investigator's report that is mandated by section 5354. Then, as provided by section 5354, upon consideration of the report and any other evidence

22

presented to it, the court may render judgment—either following or diverging from the conservatorship investigator's recommendation.

## Disposition

The writ is denied, and the stay of proceedings in the superior court is lifted as of the date this decision becomes final.  (See Cal. Rules of Court, rule 8.490(b)(2).)

TO BE PUBLISHED.


CHANEY, J.


We concur:


ROTHSCHILD, Acting P. J.


JOHNSON, J.

23