Filed 4/14/15  Public Guardian of Sonoma County v. E.H. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| PUBLIC GUARDIAN OF SONOMA COUNTY,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>E.H.,<br><br>          Defendant and Appellant. | A143271<br><br>(Sonoma County<br>Super. Ct. No. SPR82694) |

E.H. is charged with first degree murder in the April 2007 death of his mother.  Reportedly, he stabbed her with a sword 16 times after his persistent Star Wars delusions convinced him that she had been taken over by the "dark side."  After being found incompetent to stand trial pursuant to section 1370 of the Penal Code, E.H. was committed to Napa State Hospital in September 2007.  As he was not restored to competency after a period of three years, the Sonoma County Public Conservator (Public Conservator) petitioned the court in June 2010 to establish a so-called "Murphy conservatorship" for E.H. under the Lanterman-Petris Short Act (LPS Act), Welfare & Institutions Code, section 5000 et seq.[1]  This renewable one-year conservatorship was

_____

[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.  Named after the author of the 1974 legislation which created it, a Murphy conservatorship is based on an alternate definition of gravely disabled under the LPS Act applicable to persons who have been found mentally incompetent to stand trial and are charged with a violent felony.  (*In re Polk* (1999) 71 Cal.App.4th 1230, 1237.)

1

most recently extended by the trial court on August 20, 2014, to cover the period from July 26, 2014, through July 26, 2015.

E.H. appealed, and his appellate attorney has filed a brief raising no specific issues but asking us to conduct an independent review of the record pursuant to *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*) and *Anders v. California* (1967) 386 U.S. 738 (*Anders*). Although appellate counsel acknowledges that, in *Conservatorship of Ben C.* (2007) 40 Cal.4th 529 (*Ben C.*), the California Supreme Court declined to extend *Wende/Anders* procedures to "typical" LPS Act appeals, he argues that a different result is required for appeals involving Murphy conservatorships due to their entanglement with an underlying criminal matter and their less extensive procedural protections. We do not decide whether *Wende* review is mandated in this context. However, our discretionary review of the record has uncovered no issues requiring further briefing, and we therefore affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In its Conservatorship Investigation Report filed with the trial court in 2010 (Investigation Report), the Pubic Conservator indicated that E.H. had initially been diagnosed as schizophrenic in 1996 at age 22 and had been conserved on two previous occasions prior to the establishment of the Murphy conservatorship that is the subject of these proceedings. Specifically, E.H. was conserved in 2002 after he was observed throwing bullets at some young men in a parking lot. E.H.'s mother reported at that time that her son was not medicated, was delusional, and displayed paranoid behavior. Moreover, E.H. reportedly believed that " 'aliens had landed' " and that he had " 'an x-wing fighter in his head that depletes his memory.' " E.H. was integrated back into the community in 2005, but was conserved a second time in 2006 after he disclosed that he had stopped taking his psychotropic medications and that "voices were telling him to do violent things that he felt powerless to refuse." E.H. apparently showed no insight into his mental illness during this conservatorship and refused voluntary medication. He was placed in a board and care facility, where he was residing at the time of his mother's murder.

The Investigation Report further indicated that, due to his mental illness, E.H. suffered "continuous persecutory delusions about 'people who live below us needing to be rescued,' 'Star Wars,' 'conflicts in space,' individuals called 'the greys,' and believing that 'his eyes were poked out causing his brain to collapse and cease to function.' " Although he suffered from persistent, fixed delusions even when medicated, his delusions increased drastically when he was not medicated and historically manifested in violent thoughts and actions. E.H. believed that his mother was not really his biological mother and that her murder was justified due to her " 'being on the dark side' " and " 'wearing [Darth] Vad[e]r's gloves giving her power.' " E.H. additionally stated that he had killed his " 'so called mother' " because she was attempting to have psychics from Sebastopol poison his food from Applebee's. In determining that E.H. was incompetent to stand trial, the court-appointed alienist concluded: " 'Although he is aware that he is charged with killing his mother, he feels that she was not his mother and his account is so dominated by delusional themes that he is clearly incompetent and cannot answer questions in his own defense in a rational manner.' "

According to the Public Conservator, E.H. showed no remorse for his crime, did not believe he was schizophrenic (possessing instead only a "healthy" amount of paranoia), displayed continuous resistance to medication, and reported that he would not take his prescribed medications if released. Given his lack of insight, the Public Conservator opined that E.H. remained a danger to others in society. Indeed, the Public Conservator identified "no evidence" that E.H. could "successfully fend for himself or take responsibility for treatment of his mental illness." On this basis, a Murphy conservatorship was established for E.H. on July 30, 2010.

In connection with the 2011 conservatorship renewal, E.H. continued to maintain that he was not mentally ill, but that the doctors were simply unaware "of the 'dark side' forces that threaten him, because he is 'a little bit of a someone.' " E.H. further indicated that his mother had betrayed him by spreading the lie that he was mentally ill and that he did not regret her murder because " 'bad things' related to the dark side's expected rise in power will happen and would be amplified were she alive." At the time of his 2012

3

renewal, E.H.'s doctor stated that E.H. remained delusional and suspicious of other people being on the dark side. He reportedly believed that legal proceedings are part of this dark side conspiracy and that his sister had recently gone over to the dark side, along with other individuals he refused to name. In the doctor's opinion, given his persistent delusions, E.H. presented "a very real danger to kill again." In 2013, E.H.'s dark side delusions continued and he remained delusional about the people around him, opining that his treatment team members were talking to the CIA about him.

In June 2014, the Public Conservator again petitioned the trial court for reappointment as E.H.'s Murphy conservator for an additional year. The petition was supported by the medical opinion of two physicians who opined that E.H. continued to be gravely disabled as defined by subdivision (h)(1)(B) of section 5008, such that a Murphy conservatorship remained appropriate.[2] (See § 5361.) The Public Conservator also submitted evidence (via a request for judicial notice) that E.H. had been indicted for murder and been found mentally incompetent in January 2010 and that the indictment had not been dismissed. Moreover, in an accompanying declaration, E.H.'s treating physician indicated that he continued to be delusional and paranoid, had difficulty differentiating between fantasy and reality, could not assist counsel, and represented a danger to others.

---

[2] A person is gravely disabled for purposes of that statute if he or she has been found mentally incompetent under section 1370 of the Penal Code and all of the following are true: (1) the indictment or information pending against the person at the time of commitment charges a "felony involving death, great bodily harm, or a serious threat to the physical well-being of another person;" (2) the indictment or information has not been dismissed; and (3) "[a]s a result of a mental health disorder, the person is unable to understand the nature and purpose of the proceedings taken against him or her and to assist counsel in the conduct of his or her defense in a rational manner." (§ 5008, subd. (h)(1)(B).) To these statutory requirements, the California Supreme Court has added an additional, constitutionally required finding: that the conservatee is " 'currently dangerous as the result of a mental disease, defect, or disorder.' " (*County of Los Angeles v. Superior Court* (2013) 222 Cal.App.4th 434, 442-443 (*County of Los Angeles*), quoting *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 178.)

4

At the hearing on August 20, 2014, E.H.'s attending psychiatrist, Dr. Dumitrescu, was qualified as an expert in psychiatry and testified regarding E.H.'s mental condition. Although Dr. Dumitrescu had only recently been assigned to E.H's case, he met with E.H. on two occasions, talked to staff, and reviewed the conservatee's records in support of his stated observations and opinions. Specifically, Dr. Dumitrescu indicated that E.H. continued to have a diagnosis of schizophrenia, paranoid type, and that he had personally observed E.H. to suffer from "[d]elusions, primarily focused on Star Wars and paranormal, and delusions of [a] persecutory nature" which were similar to the delusions he was operating under at the time of his mother's murder. Based on E.H.'s delusions and distortion of reality, it was the psychiatrist's opinion that E.H. would not be able to understand or follow complex legal proceedings; nor would he be able to assist in his own defense. Further, E.H. remained unconvinced that he suffered from a mental disorder and told Dr. Dumitrescu that he would not take his medication if released. Dr. Dumitrescu believed that, without medication, E.H.'s condition would worsen. He further opined that there was a substantial risk that E.H.'s delusions would lead him to cause physical harm or kill another person and that he posed "a current risk for danger."

E.H. also testified. He stated that he did meditation while in jail and at Napa State Hospital, a practice that was unavailable to him before the death of his mother: "But one of the problems with it is, um, I had an open aura, and auras can be open in the front. I believe San Francisco has an open aura, France has open auras. The High Command has open auras. I believe criminal lawyers usually have open auras. . . . And you can't really do it with an open aura, at all. . . . And killing [my mother] was actually an added bonus, it closed my aura so I can be allowed to do the meditation." E.H. stated that, if released, he would return to Rohnert Park and try to continue his meditation there. This location was preferable due to an abundance of black dirt because, according to E.H., "the meditation I do, my stand-up gold thrives on black dirt around it, and really kind of dwindles on brown dirt." E.H. claimed he would support himself with social security benefits, but also stated: "I actually have some crystallized time food crystals that can come out of me . . . . It's actually crystallized time fluid. Time fluid is—it's something

5

you get from sex. It's a gift from women. . . . [A]nd they sell at about a million dollars each." His plan was to sell one of these crystals and buy a house.

With respect to the force and the dark side, E.H. further testified: "The meditation I'm doing, stand-up gold, Harrison Ford is actually a pretty major genuine threat against it. The actor. He's kind of notorious around the universe and performing lately. And he attacks it. . . . [¶] . . . And some of my circumstances have actually been pulled together with James T. Kirk in the movie, I'm helping out a little bit, helping out in the universe . . . . But the force itself actually is a threat and it actually gets taken down by the meditation, stand-up gold, that I do." According to E.H., however, the dark side forces do not necessarily need to be destroyed, as they can "actually be converted to good by doing things like wearing brown clothes and white clothes."

E.H. did not believe he was dangerous and would not take medication if released, as he gets "Satanically possessed" when he takes it. He summed things up by stating: "The universe itself just sort of needs me out soon. It would tremendously help. There's a lot of danger going on." At the conclusion of the hearing, the trial court granted the Public Conservator's petition to extend E.H.'s Murphy conservatorship. This timely appeal followed.

## II. DISCUSSION

As stated above, appellate counsel in this matter filed a *Wende* brief, asking us to conduct our own independent review of the record. In addition to setting forth the facts and procedural posture of this case, counsel indicated that he advised E.H. that he could request appointment of a new attorney. He also informed E.H. of his right to file a supplemental brief with this court within 30 days, in order to bring to the court's attention any issues E.H. believes deserve review. We have not received a supplemental brief.

Generally, speaking, *Wende* review is required only for an indigent criminal defendant's first appeal as a matter of right. (*Ben C.*, *supra*, 40 Cal.4th at pp. 535-537.) In *Ben C.*, our Supreme Court refused to extend this right of independent review to appeals from civil judgments under the LPS Act, despite the fact that such judgments result in a significant deprivation of liberty. (*Id*. at pp. 535, 537-538, 540.) Other cases

6

have similarly resisted extending *Wende* review in various noncriminal contexts, including appeals similar to the one before us. (*People v. Dobson* (2008) 161 Cal.App.4th 1422, 1425, 1430-1438 [*Wende* review not required in an appeal from a denial of a petition for restoration of competency under Penal Code section 1026.2 filed by an individual previously found not guilty by reason of insanity]; *People v. Taylor* (2008) 160 Cal.App.4th 304, 308, 312-313 [*Wende* review not required in appeal from postconviction commitment under the Mentally Disordered Offender Act, Pen. Code, § 2962 et seq.]; see also *In re Sade C.* (1996) 13 Cal.4th 952, 959 [no *Wende* review for appeals from orders affecting parental custody in juvenile dependency cases].)

Appellate counsel urges us to conclude that Murphy conservatorships should be treated differently for purposes of *Wende* review, given their criminal underpinnings and streamlined procedural structure. The provisions for Murphy conservatorships were added to the LPS Act in 1974 "in order to distinguish between persons who do, and do not, present a danger to the public. They are intended to 'address the difficult problem of integrating and resolving the conflicting concerns of protecting society from dangerous individuals who are not subject to criminal prosecution,' while 'preserving a libertarian policy regarding the indefinite commitment of mentally incompetent individuals who have yet to be convicted of criminal conduct, and safeguarding the freedom of incompetent criminal defendants who present no threat to the public.' " (*County of Los Angeles*, *supra*, 222 Cal.App.4th at p. 445; *People v. Karriker* (2007) 149 Cal.App.4th 763, 775-776 (*Karriker*).) However, although Murphy conservatorships are based on an alternate definition of grave disability under the LPS Act, they are still a type of civil commitment and, once established, they are subject to the same annual renewal process and procedural protections applicable generally to long-term LPS conservatorships. (§§ 5008, subd. (h)(1), 5361; *County of Los Angeles, supra*, 222 Cal.App.4th at pp. 442-443, 445, 454; *Karriker*, *supra*, 149 Cal.App.4th at p. 776.) Under such circumstances, we doubt an appeal involving a Murphy conservatorship is distinguishable in any meaningful way from the precedent cited above which refused to mandate *Wende* review in similar contexts.

Nevertheless, we note that, in his dissent in *Ben C.*, former Chief Justice George argued in the context of the LPS Act that "[i]t is undisputed that the private interests at stake are of the most fundamental nature, as the conservatee may be subjected to restraints upon physical freedom and personal autonomy for lengthy periods, and may be denied other basic civil rights as well." (*Ben C.*, *supra*, 40 Cal.4th at p. 545, 547 (dis. opn. of George, C.J.).) Under such circumstances, as the dissent indicates, it is a small matter "to confirm that proper procedures were followed and that the order is supported by sufficient evidence." (*Id.* at p. 555, (dis. opn. of George, C.J.).) Indeed, even the majority opinion in *Ben C.* indicates that appellate courts possess the discretion to retain such an appeal for consideration in the appropriate case. (*Id.* at p. 544, fn. 7; see also *id.* at p. 556, (dis. opn. of George, C.J.) ["[t]he majority's holding that independent review is not constitutionally required in LPS appeals in no way prevents the Courts of Appeal from expending the minimal effort required to provide these appeals with a second look and to provide an opinion that briefly notes the court has reviewed the record and that identifies the findings and evidence supporting the order"].)

Thus, while we may not be required to do so, we elect in this case to exercise our discretion to conduct a full record review, both because the record is short and because E.H. has been committed for a significant period of time without any appellate consideration of his circumstances. Having performed the discretionary review requested by appellate counsel, we find no issues that require further briefing. A court order continuing a conservatorship pursuant to section 5361 is reviewed on appeal for substantial evidence. (*Conservatorship of Walker* (1989) 206 Cal.App.3d 1572, 1577; *Conservatorship of Murphy* (1982) 134 Cal.App.3d 15, 18.) As recited above, there was substantial evidence to support the trial court's order extending E.H.'s Murphy conservatorship. Indeed, the evidence that he continues to fall within the statutory criteria was overwhelming and largely undisputed. Moreover, E.H. was ably represented by counsel, both in the trial court and on appeal. We see no error.

### III. DISPOSITION

The judgment is affirmed.

 

 

_____
REARDON, J.


We concur:


_____
RUVOLO, P.J.


_____
STREETER, J.