Filed 12/19/24

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re JOHNATHON LERKE<br><br>on<br><br>Habeas Corpus. | D084051<br><br>(Super. Ct. Nos. CD292512 &<br>MH118518) |

Petition for writ of habeas corpus.  Petition denied as moot.

Jo E. Super, Chief Deputy Public Defender, and Emily Rose-Weber, Deputy Public Defender, for Petitioner.

Rob Bonta, Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Alan L. Amann, Deputy Attorneys General, for Respondent.

Claudia G. Silva, County Counsel, and Anjana Pottathil, Deputy County Counsel, for Respondent.

The treatment of people with mental illness in our justice system is an ongoing source of concern for our lawmakers and the courts.  Since at least 2010, there has been a persistent shortage of bed space at California's state hospitals.  (*People v. Yang* (2022) 78 Cal.App.5th 120, 137; *People v. Kareem A.* (2020) 46 Cal.App.5th 58, 79; *In re Mille* (2010) 182 Cal.App.4th 635, 638–639.)  In a series of cases, California courts have granted relief to defendants found incompetent to stand trial who were being held in county jail for

unreasonably long periods of time while awaiting a bed in a state hospital for competency restoration treatment. (See *Stiavetti v. Clendenin* (2021) 65 Cal.App.5th 691, 707–711 (*Stiavetti*) [summarizing relevant case law].) These cases have recognized that the condition of mentally incompetent defendants often deteriorates due to their prolonged confinement in county jail without adequate treatment while awaiting a transfer to the state hospital. (*Id*. at p. 725 [citing cases].)

Here we are confronted with a similar issue involving mentally incompetent Murphy conservatees[1] who are "placed" in the state hospital but confined in county jail indefinitely while waiting for bed space to become available at the state hospital. According to the record before us, some individuals on Murphy conservatorships in San Diego County are incarcerated in county jail for years waiting for room in the state hospital, which in their counsel's experience often results in a significant deterioration of their mental health.

In a petition for writ of habeas corpus, Johnathon Lerke challenges his confinement at the county jail pending his transfer to the state hospital. Lerke is the subject of a Murphy conservatorship that requires his placement in a state hospital, but he was nonetheless confined in county jail for months due to an apparent lack of space at the hospital. Lerke argues his confinement at the jail was not statutorily authorized and violated his equal protection and due process rights.

---

[1] A "Murphy conservatorship" refers to a conservatorship established under Welfare and Institutions Code section 5008, subdivision (h)(1)(B). Murphy conservatorships are named after the legislator who sponsored the legislation. (*Conservatorship of Lee C.* (2017) 18 Cal.App.5th 1072, 1084 (*Lee*).) Further unspecified statutory references are to the Welfare and Institutions Code.

2

We conclude that no legal authority permitted Lerke's indefinite detention in the county jail pending his transfer to the state hospital, and he could no longer be confined in jail after the conclusion of the competency proceedings in his underlying criminal case. The statutory framework governing the placement of conservatees—including conservatees who, like Lerke, have been found to pose a substantial danger of physical harm to others—requires them to be placed in a treatment facility that adequately promotes their treatment and provides protection for the public. (§ 5358, subd. (a)(1)(B).) The county jail does not satisfy these statutory requirements and is not included in the list of facilities authorized to provide treatment to conservatees under section 5358, subdivision (a)(2). Lerke's confinement in the county jail as a Murphy conservatee was therefore unlawful.

We nevertheless deny habeas relief only because Lerke was transferred to an authorized treatment facility during the pendency of these proceedings.[2]

_____

[2] Shortly before oral argument, Lerke informed us that after being held in county jail for five months as a Murphy conservatee, he was transferred to the county psychiatric hospital, an authorized treatment facility. We take judicial notice of the court's October 2, 2024 order placing Lerke in the county psychiatric hospital pending transfer to the state hospital in the Murphy conservatorship proceeding. (Evid. Code, §§ 452, subd. (d), 459.) The Attorney General and the Office of the Public Conservator of the San Diego County Health and Human Services Agency ("Agency") have both submitted letter briefs arguing that Lerke's petition should now be dismissed as moot. Although his petition is technically moot, we exercise our discretion to decide it on the merits because this is a recurring issue of public importance. (*In re Schuster* (2019) 42 Cal.App.5th 943, 952 [habeas court has discretion to decide recurring issue of public importance even if it is not otherwise likely to evade appellate review].) Moreover, this is an issue that may otherwise evade appellate review. Indeed, we are aware of several prior cases before this court involving similar issues that were ultimately dismissed as moot

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Proceedings in the Superior Court*[3]

In November 2021, the People charged Lerke in a criminal complaint with multiple felony sex offenses.  Lerke pled not guilty to the charges.  At the readiness conference in December 2021, the trial court suspended criminal proceedings under Penal Code section 1368 and referred Lerke for a mental competency examination.  The court later found Lerke was incompetent to stand trial, and on April 25, 2022, ordered him committed to the state hospital for competency restoration treatment for a maximum term of two years.

Nearly two years later, in January 2024, the medical director of the Department of State Hospitals (DSH) informed the court that Lerke had not regained competence.  Ninety days before the expiration of Lerke's two-year commitment, on January 26, 2024, the court ordered him transported from the state hospital to the custody of the sheriff.  After Lerke was transported to San Diego County, the superior court conducted a hearing regarding his competence on April 25, 2024.

At the hearing, the court noted that a Murphy conservatorship had been established the previous day in the mental health court[4] and that Lerke

after the Murphy conservatee was eventually transferred from county jail to the state hospital.

[3]    Lerke's claims relate solely to his continued detention in the county jail following the establishment of his conservatorship, and we limit our discussion of the factual and procedural background accordingly.  Because there was no trial, and the record does not include the transcript of a preliminary hearing or grand jury proceeding, we do not include a summary of the facts underlying the criminal charges against Lerke.  According to a probable cause affidavit, the charges were based on an incident when Lerke allegedly sexually assaulted a sleeping woman on the trolley.

had been ordered placed at the state hospital under the terms of his conservatorship.[5]  Lerke's counsel asked the court to dismiss the criminal case against him because he had been deemed non-restorable.  Additionally, his counsel asked the court to order Lerke released from the county jail and placed at a local psychiatric hospital because his maximum two-year commitment under Penal Code section 1370 was set to expire that day.

The criminal court denied defense counsel's request to dismiss the criminal charges against Lerke, reasoning that the basis for his Murphy conservatorship would no longer exist if the criminal case was dismissed. The court then explained it did not have control over Lerke's current placement because it was overseeing the competency proceedings in Lerke's criminal case, rather than his conservatorship.  The court noted that the mental health court had ordered Lerke's placement at the state hospital rather than a county mental health placement.

The criminal court then expressed its "understanding" that "state hospital individuals are held in custody until [state hospital beds] are available."  According to the court, Lerke would be detained in custody based on his conservatorship and he would remain in county jail until placement

---

[4]     Two superior court judges addressed Lerke's pending matters upon his return from the state hospital: the judge overseeing the competency proceedings in Lerke's criminal case under Penal Code section 1370, and the judge overseeing the conservatorship proceedings under Welfare and Institutions Code section 5358.  We refer to the former as the "criminal court" and the latter as the "mental health court."

[5]     The parties have not provided us with the order establishing the conservatorship and requiring Lerke's placement at the state hospital. However, other court orders in the record establish the existence of the conservatorship and Lerke's commitment to the state hospital.

was available at the state hospital. However, the court invited the parties to raise the issue with the mental health court.

Thereafter, Lerke's counsel representing him in his conservatorship proceedings submitted a letter to the mental health court requesting that it order Lerke transferred to the San Diego Psychiatric Hospital pending his placement at the state hospital. The mental health court denied the request. However, it ordered the public conservator to update Lerke's individual treatment plan at the county jail and to make timely and reasonable efforts to facilitate Lerke's transfer to the state hospital.

### B. Habeas Corpus Proceedings

On May 8, 2024, Lerke filed a petition for writ of habeas corpus in this court challenging his continued confinement in the county jail.[6] He alleged he was being held in custody on his criminal case beyond the two-year maximum commitment date under Penal Code section 1370, in violation of his statutory and constitutional rights. He requested his immediate release from the county jail, or in the alternative, transfer to an appropriate treatment facility.

We requested and received informal responses and an informal reply from the parties. The Attorney General and the Agency separately filed informal responses. In its informal response, the Agency noted that "[t]he

---

[6] The record does not reflect that Lerke filed a petition for writ of habeas corpus in the superior court in the first instance. However, this court has original jurisdiction in habeas corpus proceedings, and we may exercise our discretion to review a petition in the first instance when the petition raises only issues of law. (Cal. Const., art. VI, § 10; *In re Davis* (1979) 25 Cal.3d 384, 389 [exercising discretion to decide petition in the first instance where only issues of law were raised and there were no material factual issues].) We construe Lerke's petition to solely raise the legal issue of whether his confinement in county jail was legally authorized, and we therefore exercise our discretion to address the petition in the first instance.

unavailability of beds at DSH facilities is a longstanding problem." The Agency also acknowledged case law holding that the lack of available bed space does not excuse unreasonable delay in complying with commitment orders. (See, e.g., *In re Chunn* (2022) 86 Cal.App.5th 639, 645 [acknowledging "the complex and difficult problems created by limited funding, resources, and bed space to treat IST [incompetent to stand trial] defendants at DSH facilities" but finding "that such challenges do not relieve DSH of its responsibility to provide treatment and competency restoration services within a reasonable period of time"].)

Lerke included with his informal reply a declaration by the supervisor of the Mental Health Division of the San Diego County Office of the Public Defender. The supervisor attested she had observed instances in which Murphy conservatees waited in county jail for years to be transferred to the state hospital, during which their mental and physical health significantly deteriorated. The supervisor was aware of Lerke's case and she expressed concern that his mental and physical wellbeing were at risk due to his confinement in a jail facility that was not capable of meeting his treatment needs. In her opinion, the local "County Psychiatric Hospital is a locked facility capable of detaining a person who is civilly committed on a Murphy conservatorship." The supervisor indicated she was personally aware of other Murphy conservatees facing charges more serious and violent than Lerke's who had been "held in the County Psychiatric Hospital."

Lerke's informal reply also included a declaration from the attorney who represented him in his conservatorship proceedings. In the declaration, counsel expressed his belief that the county jail at which Lerke was being detained, the George Bailey Detention Facility, did not meet the requirements of a "treatment facility" under the Lanterman-Petris-Short

7

("LPS") Act. He expressed concern regarding Lerke's continued incarceration in the county jail because the facility was not able to meet the level of psychiatric care Lerke requires.

We issued an order to show cause why the relief Lerke requested should not be granted. We asked the parties to address, among any other issues deemed appropriate: (1) whether Lerke is being confined in the county jail pursuant to his criminal case or pursuant to the terms of his conservatorship; (2) assuming Lerke is not being confined in the county jail pursuant to his criminal case, whether the Welfare and Institutions Code permits his continued confinement in the county jail pending his transfer to the state hospital; and (3) assuming Lerke may not be confined in the county jail pending his transfer to the state hospital, whether he must be released on his own recognizance. The parties have addressed these issues in their respective briefing that we describe further in our discussion.

## DISCUSSION

### A.  *The Parties' Contentions*

In his return, the Attorney General generally admitted the material allegations of the habeas corpus petition but denied that Lerke's continued custody in county jail was unlawful. Specifically, the Attorney General acknowledged that Lerke's two-year commitment for competency restoration expired on April 25, 2024; a Murphy conservatorship was established on April 24, 2024; the terms of the Murphy conservatorship required Lerke's placement in the state hospital; but Lerke nevertheless remained in custody in the county jail because there was no space available at the state hospital. The Attorney General did not allege in the return or present evidence that there was no alternative treatment facility available to place Lerke while he was waiting for a bed at the state hospital.

8

The Attorney General contended that Lerke's continued confinement in the county jail was due to his conservatorship, and not his criminal case.[7] The Attorney General acknowledged that the Welfare and Institutions Code does not expressly allow a conservatee to be confined in jail pending their placement at a state hospital. Nonetheless, the Attorney General argued that California law "implicitly" permitted Lerke's continued confinement in the jail until there was room for him at the state hospital. Alternatively, assuming the law did not allow for Lerke's confinement in the county jail pending his transfer to the state hospital, the Attorney General argued Lerke was not entitled to release on his own recognizance. Rather, the Attorney General contended Lerke should seek a change of placement hearing in the mental health court under sections 5358, subdivision (d)(2) and 5358.3.

Lerke responded in his traverse that his continued confinement in county jail was due solely to the detention order by the criminal court overseeing the competency proceedings in his criminal case, and that the mental health court acquiesced in this order when it authorized Lerke to remain in jail pending his transfer to the state hospital. According to Lerke, the "criminal court exercising jurisdiction over the criminal competency matter" did not have the authority to order his no-bail detention in the county jail pending his transfer to the state hospital. Lerke argued he could no longer be confined in the jail in his criminal case because the maximum commitment for competency restoration under Penal Code section 1370 has

[7]     Although the Agency filed an informal response before we issued the order to show cause, and then refiled its response upon direction from this court to file a confidential exhibit under seal, it did not file a formal return. After the deadline for the return passed, our clerk's office inquired of the Agency whether it intended to file one and was informed by its counsel that the Attorney General had provided the response on behalf of the People.

expired. Additionally, he contended he could not be detained in the jail under his conservatorship because the Welfare and Institutions Code did not implicitly permit Lerke's indefinite confinement in the county jail, or any other unauthorized treatment facility, pending his transfer to the state hospital. Accordingly, Lerke requested that we order his immediate release from county jail and direct the mental health court to place him in an authorized treatment facility.

The parties do not dispute that the validity of Lerke's confinement in the county jail may properly be adjudicated in a habeas corpus proceeding. A person who is unlawfully imprisoned or their liberty unlawfully restrained may prosecute a writ of habeas corpus to challenge their confinement or restraint. (Cal. Const., art. I, § 11; Pen. Code, § 1473, subd. (a).) Habeas relief is available to petitioners to challenge their unlawful confinement in county jail instead of a proper treatment facility. (See, e.g., *In re Williams* (2014) 228 Cal.App.4th 989, 994 [granting habeas relief and concluding that petitioner "may not be placed in the county jail for the purpose of receiving competency services"].) When the validity of the confinement does not turn on any disputed factual questions, as we find to be true here, the merits of the habeas corpus petition may be decided without an evidentiary hearing. (*People v. Duvall* (1995) 9 Cal.4th 464, 478–479.)

B.    *Background of the LPS Act*

The LPS Act governs the involuntary commitment and treatment of gravely disabled individuals through a conservatorship program. (*Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1008–1009 (*Susan T.*).) "Enacted by the Legislature in 1967, the [LPS Act] includes among its goals ending the inappropriate and indefinite commitment of the mentally ill, providing prompt evaluation and treatment of persons with serious mental

10

disorders, guaranteeing and protecting public safety, safeguarding the rights of the involuntarily committed through judicial review, and providing individualized treatment, supervision and placement services for the gravely disabled by means of a conservatorship program." (*Id.* at p. 1009.) A person civilly committed under the LPS Act may be subject to an involuntary confinement at a designated treatment facility, but the commitment is not the "equivalent to criminal punishment in its design or purpose." (*Conservatorship of John L.* (2010) 48 Cal.4th 131, 151.)

There are two categories of conservatorships under the LPS Act based on its definition of gravely disabled: (1) an "LPS conservatorship" pursuant to Welfare and Institutions Code section 5008, subd. (h)(1)(A); and (2) a "Murphy conservatorship" pursuant to Welfare and Institutions Code section 5008, subd. (h)(1)(B). (*County of Los Angeles v. Superior Court (*2013) 222 Cal.App.4th 434, 442 (*County of Los Angeles*).) A Murphy conservatorship may be established if a person is criminally charged with a felony offense, has been found mentally incompetent to stand trial under Penal Code section 1370, and all of the following conditions exist: (1) the charges include a felony involving death, great bodily harm, or a serious threat to the well-being of another person; (2) there has been a probable cause determination and the charges have not been dismissed; (3) as a result of a mental health disorder, the person is unable to understand the nature and purpose of the proceedings against them and to assist counsel in their defense in a rational manner; and (4) the person represents a substantial danger of physical harm to others by reasons of a mental disease, defect, or disorder. (Welf. & Inst. Code, § 5008, subd. (h)(1)(B).)

The addition of the Murphy conservatorship to the statutory scheme established by the LPS Act was intended to " 'address the difficult problem of

integrating and resolving the conflicting concerns of protecting society from dangerous individuals who are not subject to criminal prosecution, preserving a libertarian policy regarding the indefinite commitment of mentally incompetent individuals who have yet to be convicted of criminal conduct, and safeguarding the freedom of incompetent criminal defendants who present no threat to the public.' " (*Lee, supra*, 18 Cal.App.5th at p. 1085.) The LPS Act authorizes the establishment of a Murphy conservatorship for a period up to one year. (*Id.* at p. 1086.) At the end of the one-year term, the conservatorship automatically terminates unless the conservator successfully petitions for reappointment for a succeeding one-year period. (*Ibid.*; § 5361.)

C. *Placement Process for Murphy Conservatees*

A defendant's path to a Murphy conservatorship begins when criminal charges have been filed against them. (See Welf. & Inst. Code, § 5008, subd. (h)(1)(B).) If that defendant is found incompetent to stand trial during the pendency of the criminal case, the court must suspend the criminal proceedings. (Pen. Code, § 1370 (a)(1)(B).) The court must then order the defendant delivered by the sheriff to a state hospital or other available treatment facility that "will promote [their] speedy restoration to mental competence." (Pen. Code, § 1370, subd. (a)(1)(B)(i).)

The defendant's commitment term for restoration of competency under Penal Code section 1370 may not exceed two years, or a period of commitment equal to the maximum term of imprisonment for the most serious offense charged, whichever is shorter. (Pen. Code, § 1370 subd. (c)(1).) If the defendant's competence cannot be restored, they must be returned to the committing court no later than 90 days before the expiration of the maximum term of commitment. (*Ibid.*) Upon the defendant's return to the committing court, the court may order a conservatorship investigator to

12

initiate conservatorship proceedings under the LPS Act if it appears that the defendant is gravely disabled. (Pen. Code, § 1370, subd. (c)(3).) Otherwise, the defendant must be released. (*Rodriguez v. Superior Court* (2023) 15 Cal.5th 472, 496 (*Rodriguez*).)

If a conservatorship is established, the committing court must determine the appropriate level of care for the conservatee. (§ 5358, subd. (c)(2) ["The court shall determine the most appropriate placement for the conservatee."].) The primary focus in determining the appropriate level of care for a Murphy conservatee is public safety, but the placement must also achieve "the purposes of treatment of the conservatee[.]" (§ 5358, subd. (a)(1)(B); *County of Los Angeles, supra*, 222 Cal.App.4th at p. 445.) If the conservator seeks a change of placement to a less restrictive alternative than that originally ordered for a Murphy conservatee, the court may not approve the change if the court determines by a preponderance of the evidence that the placement poses a threat to the safety of the public, the conservatee, or any other individual. (§ 5358, subd. (d)(3).)

Section 5358, subdivision (a)(2), enumerates the permissible treatment facilities for conservatees under the LPS Act. It provides: "The placement may include a medical, psychiatric, nursing, or other state-licensed facility, or a state hospital, county hospital, hospital operated by the Regents of the University of California, a United States government hospital, or other nonmedical facility approved by the State Department of Health Care Services or an agency accredited by the State Department of Health Care Services, or in addition to any of the foregoing, in cases of chronic alcoholism, to a county alcoholic treatment center." Section 4100 lists the facilities over which DSH has jurisdiction, including five state hospitals; admission, evaluation and stabilization centers; approved facilities under contract with

DSH; and county jail treatment facilities under contract with DSH to provide "competency restoration services."

D. *The Law Does Not Permit a Conservatee's Indefinite Confinement in the County Jail Pending the Availability of Space at the State Hospital*

Lerke has never argued there was an insufficient basis to establish his Murphy conservatorship, nor has he contested the court's order placing him at the state hospital. Rather, he merely requested in his petition that he be removed from custody in the county jail and released or placed at an authorized treatment facility. Lerke emphasized that the Welfare and Institutions Code plainly enumerates the facilities authorized to provide treatment to a conservatee, and the county jail is not included in this list.

In response, the Attorney General does not dispute that the county jail is not one of the authorized treatment facilities for Murphy conservatees under section 5358, subdivision (a)(2). The Attorney General acknowledges that "[t]he Welfare and Institutions Code contains no provision that addresses circumstances like those presented here: where the terms of the Murphy conservatorship require placement in the State Hospital, but there is currently no room to place the conservat[ee] there." The Attorney General asserts, however, that the statutes "implicitly authorize temporary detention in a county jail facility pending placement in the State Hospital."

The Attorney General points to the violent nature of the criminal charges alleged against Lerke to support the argument that he may be detained, at least temporarily, in the jail pending his transfer to the state hospital. The Attorney General cites to Penal Code section 1370, which requires the state hospital to inform the sheriff when a placement becomes available for a defendant who is incompetent to stand trial. (Pen. Code,

14

§ 1370, subd. (a)(1)(B)(ii)(I).)  The Attorney General also notes that under Penal Code section 1370, a defendant who is charged with forcible sex offenses and subject to commitment for competency restoration must be placed at a state hospital facility or other secure treatment facility absent findings justifying an alternative placement.  (Pen. Code, § 1370, subd. (a)(1)(B)(iii).)

We conclude that Lerke has the better argument.  Even if we were to indulge the questionable assumption that a person may be confined in a penal facility based on "implicit" statutory authority, we see nothing in the statutory scheme that explicitly or implicitly authorized Lerke's indefinite confinement in county jail while awaiting a state hospital bed.  The provisions of Penal Code section 1370 cited by the Attorney General do not apply after the conclusion of competency proceedings.  These provisions merely discuss the appropriate placements for a criminal defendant who is initially found incompetent to stand trial and ordered to undergo competency restoration treatment.  (Pen. Code, § 1370, subd. (a)(1)(B).)  In that situation, the defendant's transfer to the state hospital under Penal Code section 1370 will, in many instances, originate from the county jail where the defendant has been detained due to their criminal case.  But after the expiration of the two-year commitment term under Penal Code section 1370, the defendant may no longer be detained for the purpose of restoring their competence to stand trial in the criminal case.  (*Rodriguez, supra*, 15 Cal.5th at p. 496 ["If a defendant has not regained competency within two years of the date of commitment, the defendant is either released or subject to civil conservatorship proceedings."].)  As the Attorney General notes in his return, the only options for the court after the two-year competency restoration

15

period has expired are to release the defendant or initiate conservatorship proceedings.  (*Ibid*.)

Here, Lerke underwent competency restoration treatment for two years under Penal Code section 1370.  Following his return to San Diego County, the superior court found he was non-restorable.  As the Attorney General acknowledges, the two-year maximum commitment date for restoration of competency in Lerke's criminal case expired on April 25, 2024.  The criminal court had no legal authority to order Lerke's continued detention in county jail after his commitment had expired and he was no longer subject to competency restoration treatment.  The provisions of Penal Code section 1370 that dictated Lerke's placement during his competency restoration treatment were no longer applicable.

Nor did the provisions of the Welfare and Institutions Code governing Murphy conservatorships explicitly or implicitly authorize Lerke's continued confinement in county jail while awaiting a state hospital bed.  "When interpreting a statute, we view the statutory enactment as a whole; consider the plain, commonsense meaning of the language used in the statute; and seek to effectuate the legislative intent evinced by the statute." (*People v. Beckemeyer* (2015) 238 Cal.App.4th 461, 465.)  " ' "We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent.  [Citation.]  The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context." [Citation.]  If the plain, commonsense meaning of a statute's words is unambiguous, the plain meaning controls.' " (*People v. King* (2006) 38 Cal.4th 617, 622.)

Section 5358, subdivision (a)(2) sets forth a complete list of the authorized treatment facilities at which a conservatee may be placed under

16

the LPS Act.  The list in subdivision (a)(2) does not include county jail.  A "nonmedical facility" is included on the list only if it is "approved by the State Department of Health Care Services or an agency accredited by the State Department of Health Care Services."  (§ 5358, subd. (a)(2).)  The Attorney General does not contend that the county jail has been so approved or accredited, nor is there any evidence in the record to support such a conclusion.  It would defeat the plain language of the statute to allow placement in a nonmedical facility that does not satisfy this explicit statutory requirement.  And there is nothing else in the plain text of this statute, or reflected in the statute's goals, that suggests a legislative intent to permit confinement in facilities other than those explicitly authorized.  (See *Susan T., supra*, 8 Cal.4th at p. 1008 [discussing the legislative goals of the LPS Act].)  Specifically, nothing in the statute states or even implies that a conservatee may be *temporarily* placed at a penal facility not listed in section 5358, subdivision (a)(2) while awaiting a bed in the state hospital.

Our conclusion is supported by the familiar canon of statutory interpretation, *expressio unius est exclusio alterius*.  This maxim means " 'the expression of certain things in a statute necessarily involves exclusion of other things not expressed' " (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1391, fn. 13), and it is "generally applied to a specific statute, which contains a listing of items to which the statute applies" (*In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1411).  Under this guide of statutory interpretation, we infer that a " 'listing of terms and conditions is complete[.]' " (*People v. Johnson* (1988) 47 Cal.3d 576, 593; see also *In re Carlos H.* (2016) 5 Cal.App.5th 861, 870.)  By listing authorized treatment facilities for LPS conservatees in section 5358, subdivision (a)(2)—and

17

including only certain specified nonmedical facilities—the Legislature excluded other nonmedical facilities that do not appear on the list.

Our reading of this provision comports with the overall statutory scheme, which is structured to allow an orderly transition from competency proceedings to a Murphy conservatorship—without extending the defendant's confinement in the county jail beyond the maximum term of commitment for competency restoration. As noted, the law requires that the defendant be returned to the criminal court no later than 90 days *before* the expiration of the maximum term of commitment. (Pen. Code, § 1370 subd. (c)(1).) This guarantees a 90-day window period for (1) the criminal court to decide whether to release the defendant or direct the initiation of conservatorship proceedings, and (2) the mental health court to order a conservatorship and determine an appropriate placement. Nothing in the statutory scheme contemplates the defendant's continued confinement in the county jail after the maximum term of commitment for competency restoration has expired.

We also find it significant that a Murphy conservatorship automatically terminates after one year, subject to renewal for additional one-year periods. (§ 5361.) We cannot infer that the Legislature impliedly decided to allow Murphy conservatees to languish in county jail for months or even years at a time while waiting for a proper treatment facility for much or all of their one-year term of conservatorship.

Finally, the Attorney General's argument that Lerke should have sought a change of placement hearing in the mental health court misses the point of Lerke's claim. The mental health court found that the state hospital was the appropriate level of placement for Lerke, and in doing so concluded the state hospital was a facility that adequately achieved "the purposes of treatment of the conservatee and protection of the public." (§ 5358, subd.

18

(c)(2).) Lerke did not challenge these findings, and he did not seek a change of placement from the state hospital. Rather, he argued that his indefinite confinement in county jail pending the availability of a state hospital bed was unlawful. To the extent there was no available space at the hospital in the interim, the Welfare and Institutions Code did not place the burden on Lerke to find another placement and prove its suitability or else remain incarcerated in county jail.

It is ultimately the state's responsibility to ensure compliance with the law by providing an adequate number of state hospital beds or other authorized placements to safely house and treat those committed under its own statutes. California's appellate courts have repeatedly urged the legislative and executive branches to remedy this longstanding problem. (*Stiavetti, supra*, 65 Cal.App.5th at p. 737 [citing cases].) Until now, these cases have all involved defendants awaiting space in the state hospital for competency restoration treatment, but it is no more lawful to use the county jail as a holding pen for mentally incompetent Murphy conservatees.

Accordingly, we conclude the superior court could not require or permit Lerke to remain in county jail pending his transfer to the state hospital. Rather, if there was no space immediately available at the hospital, the court was required to select another interim placement that (1) best "achieve[d] the purposes of treatment of the conservatee and protection of the public" (§ 5358, subd. (a)(1)(B)); and (2) was one of the placements authorized by section 5358, subdivision (a)(2). In other words, if the state hospital is found to be the most appropriate placement for a Murphy conservatee, but there is no space immediately available, the superior court must determine an appropriate and authorized interim placement until such space becomes available. This interim placement may not be the county jail and must be

19

one of the placements authorized by section 5358, subdivision (a)(2).  Lerke's continued confinement in the county jail was therefore unauthorized and unlawful.

We nevertheless deny habeas relief because Lerke has already been released from county jail and transferred to an authorized treatment facility during the pendency of these proceedings.  (See, e.g., *In re William M.* (1970) 3 Cal.3d 16, 31 [denying habeas petition after deciding technically moot issue on the merits in petitioner's favor].)

## DISPOSITION

The petition for writ of habeas corpus is denied as moot.


BUCHANAN, J.

WE CONCUR:


O'ROURKE, Acting P. J.


DATO, J.