Filed 5/21/26  Conservatorship of J.S. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| Conservatorship of J.S. | B349298 |
| | (Los Angeles County Super. Ct. No. 25NWMH00449) |
| PUBLIC GUARDIAN OF LOS ANGELES COUNTY, | |
| Petitioner and Respondent, | |
| v. | |
| J.S., | |
| Objector and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Rene C. Gilbertson, Judge.  Affirmed.

B. Jolene Lewis, under appointment by the Court of Appeal, for Objector and Appellant.

Dawyn R. Harrison, County Counsel, Laura Quiñonez, Assistant County Counsel, and Robert J. Hill, Deputy County Counsel, for Petitioner and Respondent.

_____

In the proceedings below, respondent Public Guardian of Los Angeles County filed a petition under the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq.) to appoint a conservator for appellant J.S., alleging she was gravely disabled due to a mental disorder.  At the initial hearing on the petition, J.S.'s counsel informed the court that she had advised J.S. about her right to a jury trial, and J.S. wanted a court trial.  The court accepted the waiver without expressly advising J.S. of her right to a jury trial, and without confirming with J.S. that she wanted to waive that right.  At the trial on the petition, the court found appellant J.S. to be gravely disabled and appointed Public Guardian as her conservator.

On appeal, J.S. contends we must reverse the court's order because: (a) the court erred in accepting a waiver of her right to a jury trial from her counsel; (b) the court erred in failing to independently advise her of her right to a jury trial; and (c) substantial evidence does not support the court's finding that she was presently gravely disabled.  We conclude that: (a) the court did not err in accepting a waiver from J.S.'s counsel; (b) even if the court insufficiently advised J.S. of her right to jury trial, any such error was harmless; and (c) substantial evidence supports the court's findings.  We therefore affirm.

2

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    *August 2025 Hearing*

In July 2025, Public Guardian filed a petition to appoint a conservator for J.S., alleging J.S. was "gravely disabled as a result of a mental disorder."  The court appointed a temporary conservator.  The following week, a "Citation" was mailed to J.S., informing her of the date and time for the hearing on the petition, and advising her that she had "the right to demand a jury trial."

At the initial August 2025 hearing on the petition, J.S. appeared with counsel.  The court greeted her, saying, "Good morning.  Nice to see you, Ms. [S].  Nice to meet you."  After requesting the attorneys' appearances, the court asked J.S.'s counsel whether she had spoken with J.S.  Counsel responded, "I did, Your Honor.  She does not wish to participate in a conservatorship.  I've advised her of her right to a court trial or a jury trial and she's requested a court trial."  The court responded, "Very well.  So with the understanding that you don't want to be on conservatorship, J[.], I'm going to waive the jury trial and note that for the record.  I find good cause to continue this matter for a court trial for you."[1]  When scheduling a date for the hearing, J.S.'s counsel asked the court if there was anything sooner as, "Ms. S[.] wanted a sooner date."

After the court told J.S. that the doctor she requested would be visiting her, J.S.'s counsel informed the court that J.S.

---

[1] The minute order from the hearing reflects that J.S. "personally waives all statutory rights to a jury trial.  Counsel joins.  The Court accepts the waiver as knowingly, intelligently, and voluntarily made."

3

wished to briefly address the court.  J.S. then stated:  "I really would like to be discharged from the facility [at] which I've been staying.  I've been there since June 17th and I have important obligations within the community that I need to return to at this point.  I'm doing sufficiently well, and I've been stable and med-compliant for a long enough period of time that I would really like to be discharged from the facility today and/or have the temporary conservatorship terminated on the basis of not being gravely disabled."

After some colloquy with counsel, counsel for Public Guardian informed the court the recommendation for J.S. was "IMD," which the court explained was "a locked facility."[2]  J.S. responded that, "when I spoke with the woman who is acting as my public guardian at the moment, she actually told me she was going to request an ERS for me, if I were to be conserved."[3]  After further discussion, the court informed J.S. there was "not much" it could do that day.  A court trial was set for mid-September 2025.

## B.  *September 2025 Trial*

At the September 18, 2025 trial, J.S. appeared remotely. After asking counsel for their appearances, the court announced

---

[2] IMD apparently stands for an Institution for Mental Disease.  (*County of Los Angeles v. Superior Court* (2013) 222 Cal.App.4th 434, 451.)

[3] According to the Los Angeles Department of Mental Health, ERS stands for Enriched Residential Services. (<https://dmh.lacounty.gov/our-services/countywide-services/aotla/> [as of May 19, 2026], archived at <https://perma.cc/Q25P-T26E>.)

the parties were "here for a court trial for Ms. [S.], and I have a previous jury trial waiver that was taken on August 6th of this year." The court then confirmed with J.S.'s counsel that J.S. did not object to proceeding while she appeared remotely; counsel confirmed, saying she had spoken with J.S. and she was "fine with moving forward with trial via CourtConnect."

### 1. Testimony

Before any witnesses testified, the court announced this was a private hearing, and J.S.'s counsel alerted the court that J.S.'s father was in the courtroom. The court asked J.S. if she was comfortable with her father remaining, and J.S. responded, "no." The court then asked her father to leave the courtroom. Two witnesses then testified.

### (a) Alete Arom

After J.S.'s counsel stipulated to Alete Arom's credentials, the court found her qualified to testify at the hearing. Arom testified she had met J.S. "on a few occasions." She first met J.S. in November 2024, when she performed a competency evaluation on J.S. and found her competent to stand trial.[4] She next interviewed J.S. in June 2025 in connection with a petition for writ of habeas corpus that J.S. filed. Arom testified at the hearing, and J.S. was "held on her hold." She again interviewed J.S. on July 29, 2025, for another petition for writ of habeas corpus; J.S. was again "kept in the hospital." Since then, Arom "made multiple attempts to interview her"—three attempts the previous day and one attempt the day of her testimony—but J.S. declined to speak with Arom. When the court asked whether

---

[4] The record is silent as to why J.S. was on trial.

5

Arom felt she had sufficient information to testify about J.S., Arom confirmed she did, explaining she had also received updates regarding J.S. from the hospital and from the conservator.

Arom opined that J.S. suffered from "bipolar disorder with psychotic features most recent episodes manic [*sic*]." Arom testified J.S. had informed her that, after the court terminated her conservatorship in April 2025, she "briefly stayed with her grandmother but left" and "stopped taking her medication." J.S. gave "many different explanations and reasons why she stopped taking her medication, most of them blaming others." She also "picked up" a "criminal charge" over "some trouble at the airport."

Arom agreed that when J.S. stopped taking her medication, it caused her "to decompensate to the point where she was hospitalized on three occasions and is currently hospitalized for the fourth occasion." Arom testified that J.S. might have taken her medication for a few days between hospitalizations "but [was] predominantly noncompliant when out of the hospital."

J.S. told Arom that "on this fourth occasion . . . she had stopped taking her medication. She was wandering. She lost her shoes. Her feet were bleeding. She was covered in menstrual blood in an alley in Pasadena, and a good Samaritan called and had her admitted to the hospital." J.S. added that "at that time[,] she was delusional and believed that she was God, and that she might not be in this world."

Arom testified that when she met J.S. in connection with the two petitions for writs of habeas corpus, J.S. "was more stable" because she was "hospitalized," "on medication," and "very motivated to do well, to get out, and to win her hearings" but she

6

"still had manic ideas about her plan for self-care" and "was gravely disabled."

When asked how J.S.'s mental health condition affected her ability to take care of herself, Arom explained that J.S. "has proven time and again that she stops taking her medication when given an opportunity." Arom explained that J.S. informed her that when her conservatorship was last terminated, she "promised Judge Herin that she would stay on" her medications, and that the judge had even "lectured her and was very firm," yet J.S. stopped taking her medication anyway, and "severely decompensates to the point where she absolutely cannot manage her food, clothing, and shelter." Arom also found significant that J.S. was "hospitalized four times in a very short order." Arom opined that "the only time she's really been stable is when on a conservatorship" and that, "when she is good and when she's stable, she is very convincing, and she says 'this time is going to be different' and this time there's all these reasons that she's going to take her medication; and even though she sounds very believable, I think ultimately, she does not take her medication, and she cannot manage reasonable decisions."

When asked about J.S.'s stated plans if the court were to terminate her conservatorship, Arom testified that J.S. intended to return to U.C. Santa Cruz where she had been a student. J.S. claimed "she had organized everything to get financial aid, go to Santa Cruz, move into student housing, and resume her education there and live off of her financial aid." Arom opined this was not a viable plan for multiple reasons: Arom had seen no evidence U.C. Santa Cruz had "reaccepted" J.S.; Arom believed there were "many hoops that have to be cleared, including a letter from a mental health professional"; Arom had

seen no evidence J.S. had been awarded financial aid; and Arom was unclear "how one can begin school in the middle of the year." Arom testified the most important reason the plan was not viable was "the fact that she cannot manage on her own at this point because of the frequent . . . discontinuation of medication and decomposition." Specifically, J.S.'s "inability to stay medicated prevents her from managing any food, clothing, or shelter, especially completely independently at UC Santa Cruz with absolutely no verification." Arom concluded there was no alternative to a conservatorship.

On cross-examination, Arom testified that, based on "staff reports and some follow up," J.S.'s symptomology has "gotten significantly worse" since Arom last spoke with her in July 2025. Arom added that J.S. was "on a *Riese* petition."[5]

### (b)   J.S.

J.S. testified that, if released from conservatorship, she would live in "off-campus housing that's provided to UC Santa Cruz students by a website that is tailored and geared towards us Santa Cruz students, such that they can rent and sublet to one

---

[5] "A Medication Capacity or Riese hearing (WIC 5332-5334) is a facility-based hearing to determine if a person on any of the LPS holds or on a temporary conservatorship has the capacity to refuse psychiatric medications." (Medication Capacity or Riese Hearing <https://www.lacourt.ca.gov/pages/lp/mental-health/tp/facility-based-hearings/cp/medication-capacity-or-riese-hearing> [as of May 19, 2026], archived at <https://perma.cc/Z379-2487>.) Public Guardian contends that "[b]y referring to *Riese*, Dr. Arom meant that the power to involuntarily medicate J.S. had to be invoked." (Fn. omitted.) J.S. does not dispute Public Guardian's interpretation.

another." She claimed she had received documentation confirming her readmission to the school as well as a financial aid package she intended to accept as soon as she was out of the hospital.[6] After that, she could arrange her housing and enroll in classes. The financial aid would cover housing and tuition but not food, so J.S. was "applying for EBT." She did not know the exact amount of her financial aid package but said she would "see it when it's on my computer" and that it was "need-based" so would be sufficient to cover her needs. J.S. also believed her parents would help her out financially, "though . . . they've given me no guarantees of as much yet." She testified that, once she went to Santa Cruz, "I think that I will be able to figure out how to get myself a job so that I can both save some money and also contribute to my own living."

J.S. stated she suffered from "bipolar one disorder with psychotic features." When unmedicated, "I become psychotic in which I believe things that aren't true, as in I believe delusions; and when I'm also not on my medication, I can -- I can either be very depressed or I can be very manic, meaning that I have elevated mood or I am incapable of functioning because I feel very depressed so that I may even be too puzzled."

When asked whether she was willingly taking her medications, J.S. responded, "Only when I'm on medications that help me." She explained she had been prescribed Klonopin, Lithium, Valproic Acid, and Seroquel, but only Klonopin and Lithium helped her—"the other two medications are unnecessary and cause me to gain weight and cause other unnecessary side

---

[6] Any such documentation is absent from the appellate record, and the record does not reflect that J.S. sought to introduce any documents into evidence.

9

effects that are harmful to my body." J.S. had discussed these side effects with her doctor, but "he has not been willing to take me off of them, in spite of the fact that I told him that they are unnecessary and they're not helpful to me."

J.S. testified that if she were not in a conservatorship, she would "absolutely" continue with mental health treatment, explaining she would find a psychiatrist through Medi-Cal or through Anthem (provided through U.C. Santa Cruz) and would get her medication through her health insurance, either from a pharmacy or hospital, or through her psychiatrist. J.S. stated, "Medication is important for people who need them [*sic*]. I'm someone who needs them, and therefore, I can get them when I need them because I need them."

J.S. disagreed with Arom's testimony that her most recent hospitalization was due to not taking her medication. J.S. claimed, "a lot of things happened that didn't have to do with whether or not I made the choice to take my medication. A lot of things happened that had to do with the fact that I was either prevented from taking my medication or something stopped me, even though I was about to take my medication. Something being my brother." But it would be different if the court released her from conservatorship this time because "I'm going to be living in Santa Cruz far away from people who make my mental health worse." J.S. did not believe she needed a conservatorship because "I know how to take care of myself, and I have a plan for self-care, which includes shelter, food and clothing, which demonstrates that I'm not gravely disabled."

On cross-examination, J.S. admitted that, in April 2025, she also told the judge at her conservatorship hearing that she was going to continue to take her medication, "and I meant it."

10

But J.S. was "prevented" from continuing with her medication for several reasons: "It was stolen from me. I was stopped and told I had already taken it, when I hadn't take[n] it yet; and let's see. The last reason is I was not able to get home to get my medication because I couldn't walk, like, 15 miles to get home to get my medication, and the only person who could help me get my medication was not willing to help me get the medication." She admitted not taking her medication caused her to "end[] up in the hospital because I became manic and unstable." She stated that if her medication were stolen this time, she would "go to someone, ask for a phone number for a pharmacy, go to -- call the pharmacy, tell them that I need a new prescription of my medication and then work through whatever hoop I need to work through in order to get my medication immediately"—something she did not do the last time her medication was stolen "because I never expected to have my medication stolen before." When asked what medication she would take, J.S. testified, "I just take medication that helps me" but "I will not take medication that does not help me."

### 2. Ruling

After brief arguments from counsel, the court reviewed the evidence. The court found Arom's testimony "very credible as she discussed in some detail not just the period of decompensation, but her professional opinion as to what happens in those situation[s] with [J.S.] and how it impacts her." Conversely, the court was "not satisfied with some of [J.S.]'s explanations regarding why she was unable or not in a position or was prevented . . . from taking her medication."

While J.S. "gave some explanation as to" her future plans, "this fell short, and in the court's judgment[, J.S.] was lacking in

11

her ability to make sure that her basic needs are met." The court found that J.S. had "some limited insight" but that it was "pretty clear from Dr. Arom's testimony, as well as from [J.S.] herself, that she is not going to continue her medication." The court stated J.S.'s ideas for self-care "in a vacuum are very good ideas, but in the opinion of Dr. Arom at this point in time, she's just currently not in a position to carry out those goals and objectives without . . . a bit more time and work on her part." The court concurred that J.S.'s plan to reenroll in U.C. Santa Cruz was not a "viable plan." When the court asked J.S.'s conservator to contact U.C. Santa Cruz to ensure J.S. retained her spot in a future class, J.S. interrupted the court to state she "would really prefer that no one intervene with my education, and that includes my public guardian in that matter because I do not find my public guardian to be sophisticated and intelligent and I'd . . . prefer she not involve herself in my studies."

After addressing J.S.'s statement, the court found "beyond a reasonable doubt, based on the evidence presented[,] that [J.S.] is currently gravely disabled" and appointed Public Guardian as her conservator. The court stated that "locked subacute will be identified as least restrictive for [J.S.]" and made other rulings.[7] As the court began thanking the parties for being present, J.S. interrupted with, "Judge? Your Honor? Your Honor? Your

---

[7] (Welf. & Inst. Code, § 5358, subd. (a)(1) ["When ordered by the court after the hearing required by this section, a conservator appointed pursuant to this chapter shall place his or her conservatee as follows: [¶] (A) For a conservatee who is gravely disabled, as defined in subparagraph (A) of paragraph (1) of subdivision (h) of Section 5008, in the least restrictive alternative placement, as designated by the court"].)

Honor?" After the court acknowledged her, J.S. asked, "Did you say, 'lease restrictive'?" The court explained that "least restrictive at this time is identified as locked subacute, which . . . in plain language . . . [is] like an IMD placement."

J.S. timely appealed.

## DISCUSSION

J.S. argues we must reverse the court's order appointing Public Guardian as her conservator because: (a) the court erred in accepting J.S.'s waiver of a jury trial through her counsel; (b) the court erred in not informing her of her right to a jury trial; and (c) substantial evidence does not support the court's conclusion that she is gravely disabled. We address each contention in turn.

### A. *The Court Did Not Err in Accepting J.S.'s Waiver of a Jury Trial Through Her Counsel*

#### 1. J.S.'s Counsel Validly Waived J.S.'s Right to a Jury Trial

Under the Lanterman-Petris-Short Act, "[a] conservator of the person, of the estate, or of the person and the estate may be appointed for a person who is gravely disabled." (Welf. & Inst. Code, § 5350.) "The person for whom conservatorship is sought shall have the right to demand a court or jury trial on the issue of whether the person is gravely disabled." (*Id.* at subd. (d)(1).) "[B]efore the establishment of a conservatorship of the person or estate, or both, the court shall inform the proposed conservatee of all of the following: [¶] . . . [¶] (6) The proposed conservatee has the right to oppose the proceeding, to have the matter of the establishment of the conservatorship tried by jury, to be

13

represented by legal counsel if the proposed conservatee so chooses, and to have legal counsel appointed by the court if not otherwise represented by legal counsel." (Prob. Code, § 1828, subd. (a).)[8]

Here, at the initial hearing on the petition, the court asked J.S.'s counsel whether she spoke with J.S. J.S.'s attorney responded, "I did, Your Honor. She does not wish to participate in a conservatorship. I've advised her of her right to a court trial or a jury trial and she's requested a court trial." The court responded, "Very well. So with the understanding that you don't want to be on conservatorship, J[.], I'm going to waive the jury trial and note that for the record. I find good cause to continue this matter for a court trial for you."

J.S. argues the court erred by failing to elicit a waiver of her right to jury trial from her personally, as opposed to from her counsel. We disagree.

We find instructive *Conservatorship of Mary K.* (1991) 234 Cal.App.3d 265 (*Mary K.*) and *Conservatorship of C.O.* (2021) 71 Cal.App.5th 894 (*C.O.*).

In *Mary K.*, at the initial hearing on the petition, the court inquired of appellant's counsel whether he had spoken with his client. (*Mary K.*, *supra*, 234 Cal.App.3d at p. 269.) Counsel responded that he had, and "[s]he has indicated that she doesn't feel that she needs a conservator and for that reason, while she is not requesting a jury trial, she would like the Court itself to have

_____

[8] This section of the Probate Code is incorporated into the LPS Act. (Welf. & Inst. Code, § 5350 ["The procedure for establishing, administering, and terminating a conservatorship under this chapter shall be the same as that provided in Division 4 (commencing with Section 1400) of the Probate Code"].)

14

a trial on her behalf." (*Ibid.*)  On appeal, the appellant argued that "California law requires that the conservatee herself be advised of her rights and that the conservatee personally waive them" and that "the court's failure to procure such personal waivers here require reversal of the judgment." (*Ibid.*)  The appellate court disagreed, finding "an on-the-record personal waiver of a jury trial is not required from the proposed conservatee.  Rather, counsel may validly waive the conservatee's right to a jury trial." (*Id.* at p. 271.)  "Here, appellant's counsel stated he had spoken with his client and she wished to waive a jury trial.  Appellant does not contend her attorney was without actual authority to waive a jury.  Thus, the record supports the conclusion that the right to a jury trial on the conservatorship petition was validly waived." (*Ibid.*)

Similarly, in *C.O.*, "C.O. had been placed under an LPS conservatorship with the public guardian as conservator." (*C.O.*, *supra*, 71 Cal.App.5th at p. 901.)  The public guardian then "petitioned for reappointment as LPS conservator for C.O.," and the court caused a written citation to be served on C.O., informing him of the time and date for the hearing on the petition, and advising him that he had "the right to a court or jury trial on the issue of grave disability." (*Ibid.*)  At the initial hearing, C.O.'s attorney informed the court, in C.O.'s presence, "Your Honor, I've had a chance to speak with [C.O.] a couple of times before today's court hearing.  And at this time [C.O.] is requesting a court trial." (*Id.* at p. 902.)  The trial court set the matter for a court trial and "did not advise C.O. on the record of his right to a jury trial or elicit a personal waiver of that right from him." (*Ibid.*)  Neither C.O. nor his attorney requested a court trial at the initial hearing or at the trial itself.  (*Ibid.*)

15

On appeal, C.O. "contends the trial court was statutorily required to obtain from him a personal waiver of his right to jury trial, and the trial court erred by relying upon the waiver by his counsel." (*C.O.*, *supra*, 71 Cal.App.5th at p. 909.) The appellate court disagreed, holding that "absent circumstances suggesting the proposed conservatee's counsel lacked actual authority, counsel disregarded his client's wishes, or that the proposed conservatee was actually unaware of his right to a trial by jury . . . counsel may waive on behalf of the proposed conservatee his or her right to have the matter of establishment or reestablishment of the conservatorship decided by jury trial." (*Id.* at p. 911.) The appellate court also found "there is substantial evidence supporting the trial court's implied finding that C.O.'s waiver was knowing and voluntary given the citation mailed to him that explained his right to jury trial, the evidence that his counsel informed him of his right to jury trial, his presence at the hearing when his counsel stated he wished a 'court trial,' and the evidence of his communications with his counsel about how he wished to proceed." (*Id.* at pp. 918–919.)

J.S.'s situation is essentially identical to those discussed in *Mary K.* and *C.O.* The citation mailed to J.S. explained her right to a jury trial. J.S.'s counsel stated, in J.S.'s presence, that she had specifically advised J.S. on her right to a jury trial, and J.S. requested a court trial. Neither in the proceedings below nor on appeal has J.S. suggested—much less pointed to any evidence— demonstrating that her counsel deceived the court or lacked authority to waive the right to a jury trial on her behalf. J.S. does not claim she was unaware of her right to a jury trial.

Moreover, the record affirmatively demonstrates J.S. understood what was happening both at the initial hearing and

at trial, and was able to advocate for herself.  At the initial hearing, as the court was setting a trial date on the conservatorship petition, J.S. was able to communicate to her counsel that she wanted a sooner trial date.  After the court set a trial date, J.S. personally addressed the court to explain why she should be released immediately.  When Public Guardian's counsel informed the court the recommendation for J.S. was "IMD," J.S. told the court her temporary guardian had informed her she would request an "ERS" for her.

On the day of trial, before testimony began, she expressed being uncomfortable that her father was in the courtroom.  As the court was ruling on the petition and stating it would direct the conservator to contact U.C. Santa Cruz to ensure it would keep a spot open for J.S. in a future class, J.S. interrupted the court to express her opposition to this direction.  And, when J.S. was unsure the court had said "least restrictive," she persistently sought the court's attention until she was able to ask about it.

On this record, we conclude J.S. validly waived her right to a jury trial.

### 2.  J.S.'s Arguments to the Contrary Are Unpersuasive

J.S. cites several cases that she claims stand for the proposition that the court was not permitted to accept a jury waiver from her attorney.  We find her authority distinguishable.

J.S. first cites to a pair of Supreme Court cases regarding waiving the right to jury trial in the context of other civil commitment proceedings.  In *People v. Blackburn* (2015) 61 Cal.4th 1113 (*Blackburn*), our Supreme Court held that, in proceedings to extend the involuntary commitment of a mentally disordered offender, "the trial court must advise the MDO

17

defendant personally of his or her right to a jury trial and, before holding a bench trial, must obtain a personal waiver of that right from the defendant unless the court finds substantial evidence—that is, evidence sufficient to raise a reasonable doubt—that the defendant lacks the capacity to make a knowing and voluntary waiver, in which case defense counsel controls the waiver decision." (*Id.* at p. 1116.)

Similarly, in *People v. Tran* (2015) 61 Cal.4th 1160 (*Tran*), our high court stated that in proceedings to extend the commitment of a person originally committed after pleading not guilty by reason of insanity to a criminal defense, the "trial court must advise the NGI defendant personally of his or her right to a jury trial and, before holding a bench trial, must obtain a personal waiver of that right from the defendant unless the court finds substantial evidence that the defendant lacks the capacity to make a knowing and voluntary waiver, in which case defense counsel controls the waiver decision." (*Id.* at p. 1163.)

J.S. cites these cases to support her argument that the trial court was required to advise her personally as to her jury trial rights, and to "obtain from her a personal, knowing, and intelligent waiver of that right." But in both *Blackburn* and *Tran*, our Supreme Court cited mandatory statutory language requiring a personal waiver. For mentally disordered offenders, the Court noted that Penal Code section 2972, subdivision (a) provides that "[t]he trial shall be by jury unless waived by both the person and the district attorney." (*Blackburn, supra*, 61 Cal.4th at p. 1124.) The Court held that "person" referred to the individual facing involuntary commitment. (*Id.* at pp. 1124–1125.) Similarly, "in a commitment extension proceeding, . . . '[t]he trial shall be by jury unless waived by both

18

the person and the prosecuting attorney.' " (*Tran, supra*, 61 Cal.4th at p. 1163, quoting Pen. Code, § 1026.5, subd. (b)(4).)

By contrast, J.S. cites no such mandatory language in the LPS Act, and we have found none. (See Prob. Code, § 1828, subds. (a)(6) & (b) [court must inform proposed conservatee of right to jury trial but after informing proposed conservatee of her rights, court must "consult" proposed conservatee for her opinion on "[t]he establishment of the conservatorship," "[t]he appointment of the proposed conservator," and "[a]ny order requested under Chapter 4 (commencing with Section 1870), and in the case of an allegedly developmentally disabled adult, of each limitation requested in that order"]. Nothing states the court must consult the proposed conservatee about her opinion on a jury trial.) Therefore, unlike in the contexts discussed in *Blackburn* and *Tran*, there was no similar requirement that the court obtain a personal waiver from J.S. herself. (See also *C.O.*, *supra*, 71 Cal.App.5th at pp. 911–912 [explaining why differences in statutory language between LPS Act and statutes discussed in *Blackburn* and *Tran* result in different conclusions regarding ability of counsel to waive jury trial right].)

Nor are we persuaded by *Conservatorship of Heather W.* (2016) 245 Cal.App.4th 378. There, the trial court failed to advise the appellant of her right to a jury trial, and her counsel did not request a jury trial. (*Id.* at p. 381.) On appeal, the appellate court reversed the order appointing a conservator. (*Id.* at p. 382.) Citing *Blackburn* and *Tran*, the appellate court held "LPS commitment proceedings require the court to obtain a personal waiver of the right to a jury trial from the proposed conservatee." (*Id.* at p. 383.)

19

As explained above, both *Blackburn* and *Tran* relied on specific statutory language absent here. Moreover, *Heather W.* acknowledged that *Mary K.* arrived at a different result because, in *Mary K.*, " 'counsel stated he had spoken with his client and she wished to waive a jury trial' " and the appellant in *Mary K.* " 'does not contend her attorney was without actual authority to waive a jury.' " (*Heather W.*, *supra*, 245 Cal.App.4th at p. 384.) "By contrast, the record here does not indicate that Heather W. was given the choice to have a jury trial." (*Ibid.*)

Here, the record is undisputed that J.S.'s counsel stated she had spoken with J.S. about her right to a jury trial, and that J.S. wanted a court trial.[9]

## B. *To the Extent the Court Erred by Not Explicitly Advising J.S. About Her Right to Trial by Jury, That Error Was Harmless*

J.S. also contends the court erred in failing to advise her of her right to jury trial, which is a structural error requiring automatic reversal. Public Guardian disagrees, arguing that, by directly telling J.S. it was "going to waive the jury trial," the court informed her of her right to a jury trial. Additionally, Public Guardian contends any error should be analyzed under

---

[9] Because we find J.S. validly waived her right to a jury trial, we need not address her contention that "[i]f, as here, a person is not informed of her right to a jury trial and no waiver of a jury trial is taken from her, she has not been afforded the due process to which she is entitled before being deprived of her right to a jury trial." (See *C.O.*, *supra*, 71 Cal.App.5th at p. 914 ["we do not agree that a trial court's failure to obtain a personal waiver on the record of the proposed conservatee's right to a jury trial violates a constitutional due process right"].)

the prejudicial error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). While neither party cites authority on what constitutes a sufficient advisement of a right to a jury trial, we need not resolve this dispute because, assuming the court's advisement was insufficient, we agree with Public Guardian that we determine whether the error prejudiced J.S., and it did not.

This issue was addressed in *C.O.*, discussed above. After agreeing with C.O. that the trial court was required under the LPS Act to personally advise him of his right to a jury trial, the appellate court concluded the failure to do so "by itself does not warrant automatic reversal," and C.O. was required to prove prejudice under *Watson*. (*C.O.*, *supra*, 71 Cal.App.5th at pp. 908, 919.) Citing *Blackburn*, *supra*, 61 Cal.4th at p. 1136, the *C.O.* court noted our Supreme Court's holding that "a trial court's acceptance of a defendant's personal waiver [of a right to jury trial] without an express advisement may be deemed harmless if the record affirmatively shows, based on the totality of the circumstances, that the defendant's waiver was knowing and voluntary." (*C.O.* at p. 918.) The appellate court found the trial court's error harmless, noting it saw "nothing in the record suggesting that C.O. would have elected a jury trial over a court trial if the trial court had advised him personally at the court proceeding of his right to the former." (*Id.* at p. 919.) We reach the same conclusion.

J.S. contends that "[t]he effect of not informing Appellant of her right to a jury trial and allowing her counsel to waive that right was to deny that right to Appellant." She then goes on to argue that "no error is more structural than the denial of a jury trial" and cites several cases supporting this proposition. But we reject the premise of J.S.'s argument—as discussed above, we

21

find the record affirmatively demonstrates, based on the totality of the circumstances, that J.S.'s waiver of her right to a jury trial was knowing and voluntary.[10]

## C.   *The Court Did Not Err in Finding L.S. Gravely Disabled*

"The 'pivotal issue' in each [LPS] proceeding is whether the proposed conservatee is 'presently' gravely disabled." (*Conservatorship of A.B.* (2026) 118 Cal.App.5th 362, 374, review denied Apr. 22, 2026, S295302 (*A.B.*).)  Here, the court found "beyond a reasonable doubt, based on the evidence presented that [J.S.] is currently gravely disabled."

J.S. contends the court erred because: (1) substantial evidence does not support the court's finding that she was presently gravely disabled; (2) substantial evidence supported a

---

[10] In her reply brief, J.S. cites *K.R. v. Superior Court* (2022) 80 Cal.App.5th 133, arguing it constitutes a "split in authority" regarding whether the harmless error standard applies in this case.  *K.R.* is inapposite.  As *K.R.* recognized in declining to apply the harmless error analysis set forth in *C.O.*, "*C.O.* held that where a trial court *accepts counsel's waiver* of the jury trial right on the client's behalf, the court's failure to personally advise the proposed conservatee of the jury trial right does not by itself warrant automatic reversal and may be found harmless if the record affirmatively shows, based on the totality of the circumstances, that the waiver was knowing and voluntary. (*C.O.*, at p. 918.)  Here, however, the record contains no indication that K.R.'s counsel purported to waive K.R.'s jury trial right or that the trial court acted to accept any such waiver." (*K.R.*, at p. 144.)  In the instant case, it is undisputed that J.S.'s counsel purported to waive her jury trial right, and the court accepted the waiver.

conclusion that J.S. could provide for her basic needs; and (3) the court relied too heavily on Arom's testimony without giving "proper weight" to J.S.'s testimony. We discern no error.

On appeal from an order establishing a conservatorship, "[w]e review the whole record in favor of the judgment below to determine whether there was substantial evidence [the appellant] was gravely disabled beyond a reasonable doubt." (*Conservatorship of S.A.* (2020) 57 Cal.App.5th 48, 54 (*S.A.*).) "Substantial evidence includes circumstantial evidence and reasonable inferences flowing from it." (*Ibid.*) "Testimony of one witness can suffice to support a finding of grave disability." (*Ibid.*)

J.S. contends it was "improper to find a potential conservatee is gravely disabled based on a 'likelihood' that if she were released she would at some future time stop taking her psychotropic medication" because "[t]he pivotal issue is whether the person is 'presently' gravely disabled."

"But a person may be found gravely disabled if the evidence shows the person cannot provide for basic personal needs for food, clothing or shelter without medication and will not take the necessary medication unless required to do so." (*A.B.*, *supra*, 118 Cal.App.5th at p. 374; see also *S.A.*, *supra*, 57 Cal.App.5th at p. 54 ["Evidence conservatees (1) lack insight about their mental illness, (2) would not take medication without the support of a conservator, and (3) could not provide for themselves without medication is enough to support a court's finding of grave mental illness"].) "When applying the definition of mental disorder . . . , the historical course of the person's mental disorder, as determined by available relevant information about the course of the person's mental disorder, shall be considered when it has a

23

direct bearing on the determination of whether the person is a danger to others, or to himself or herself, or is gravely disabled, as a result of a mental disorder." (Welf. & Inst. Code, § 5008.2, subd. (a).)

Here, the court found it was "pretty clear" that J.S. "is not going to continue her medication" and that she had only "some limited insight" into her mental health issues. Substantial evidence supports these findings.

Arom testified that, when the court terminated J.S.'s conservatorship in April 2025, J.S. had "promised Judge Herin that she would stay on" her medications, and that the judge had even "lectured her and was very firm," yet J.S. stopped taking her medication anyway. She then "decompensate[d] to the point where she was hospitalized" four times. On the latest occasion, J.S. "was wandering. She lost her shoes. Her feet were bleeding. She was covered in menstrual blood in an alley in Pasadena." She also "was delusional," and "believed that she was God, and that she might not be in this world."

Arom opined J.S. was "predominantly noncompliant [with taking her medication] when out of the hospital," and "has proven time and again that she stops taking her medication when given an opportunity." Arom also testified J.S. was on a "*Riese* petition," meaning she was being involuntarily medicated. And when J.S. stopped taking her medication, she "severely decompensates to the point where she absolutely cannot manage her food, clothing, and shelter." Thus, Arom testified J.S.'s plan to return to U.C. Santa Cruz was not viable for several reasons, the most important of which was that her "inability to stay medicated prevents her from managing any food, clothing, or

24

shelter, especially completely independently at UC Santa Cruz with absolutely no verification."

J.S. herself testified that she only believed two of her four medications were helpful to her and, if released from conservatorship, she would "just take medication that helps me" but would "not take medication that does not help me." In other words, she would not take two of the four medications prescribed to her.

This testimony constitutes evidence supporting findings that J.S. lacked some insight into her mental health issues, would not take all her prescribed medication without the support of a conservator, and could not provide for herself without medication. Therefore, substantial evidence supports the court's findings that she was presently gravely disabled.

J.S. argues that substantial evidence supported a finding that she had a viable plan to provide for her basic needs. Even were that true, "when two or more inferences can reasonably be deduced from the facts, either deduction will be supported by substantial evidence, and a reviewing court is without power to substitute its deductions for those of the trial court." (*People v. Fulcher* (1987) 194 Cal.App.3d 749, 752.)

Finally, J.S. argues "[t]he court's verdict finding appellant gravely disabled was not supported by substantial evidence in the record" because "[t]he court relied on expert testimony opining that Appellant lacked insight and was likely to stop taking her medication" but "failed to take into account testimony of Appellant's present plan to voluntarily accept treatment and to provide food, clothing and shelter." In other words, J.S. faults the court for giving greater weight to Arom's testimony and discounting her own, and in essence asks us to reweigh that

25

testimony to reach a different conclusion.  This we cannot do. (See, e.g., *S.A.*, *supra*, 57 Cal.App.5th at p. 56 ["We do not reweigh evidence"].)  Moreover, the court found Arom to be "very credible" but was "not satisfied with some of [J.S.]'s explanations regarding why she was unable or not in a position or was prevented . . . from taking her medication."  "[A]fter a bench trial, we review the court's determinations about witness credibility with extreme deference."  (*Id.* at p. 55.)

We conclude that substantial evidence supports the court's finding that J.S. was currently gravely disabled.

## DISPOSITION

The court's order is affirmed.

NOT TO BE PUBLISHED

M. KIM, J.

We concur:

ROTHSCHILD, P. J.

WEINGART, J.

26